**HERCULES BUMPERS, INC.,**
Plaintiff–Appellee,

v.

**FIRST STATE INSURANCE COMPANY**
and Aetna Casualty & Surety
Company, Defendants–Appellants.

No. 88–8082.

United States Court of Appeals,
Eleventh Circuit.

Jan. 17, 1989.

Ronald D. Reemsnyder, Neely & Player, David C. Marshall, Atlanta, Ga., for defendants-appellants.

Terry J. Marlowe, Burt & Burt, Albany, Ga., for plaintiff-appellee.

Before ANDERSON and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

Hercules Bumpers, Inc. brought this declaratory judgment action asking the court to declare that First State Insurance Company ("First State") and Aetna Casualty & Surety Company ("Aetna") are, pursuant to certain liability insurance policies, contractually obligated to defend Hercules Bumpers in the lawsuit filed against it by John Wayne Reed, and to pay any judgment that might be entered against it in that case. All parties agreed that the pertinent facts were not in dispute, and each moved for summary judgment. The district court entered judgment in favor of Hercules Bumpers against First State and in favor of Aetna against Hercules Bumpers. First State appeals; it argues that the district court misconstrued the relevant provisions of its insurance contract with Hercules Bumpers. We agree.

I.

Throughout the span of time relevant to this case, Hercules Bumpers was insured under a primary general liability insurance policy issued by Aetna; it initially provided coverage for the year April 11, 1982 to April 11, 1983, and, upon renewal, the year beginning April 11, 1983. The aggregate limit of this primary policy was $500,000 per year. In addition, Hercules Bumpers carried a First State "umbrella" or "excess" insurance policy designed to provide coverage only after the exhaustion of the aggregate limit of the primary policy. The first anniversary of the First State policy was April 1, 1983. Therefore, since the effective dates of the primary and excess policies did not coincide, there was an eleven day period in 1983 during which the expiring primary policy year and the new excess policy year overlapped.

As of the beginning of this 11 day period, Aetna had paid claims totalling $387.10 as a result of occurrences happening during the policy year beginning April 11, 1982. An outstanding claim arising from another occurrence earlier that policy year (the Owens claim) remained pending, and another claim would subsequently arise (the Reed claim). Eventually, because Hercules Bumpers' liability would exceed the policy's aggregate limit, Aetna tendered $499,612.90, the policy's net limit, to First State asking that it, the excess insurer, process and settle the claims.[1]

---

1. First State agreed to manage the Reed claim, and settle it if possible, but it expended the entire amount tendered by Aetna in settling the Owens claim and, therefore, had no Aetna money remaining with which to settle the Reed claim. Although Hercules Bumpers laments over this in its brief, its counsel stated unequivocally during oral argument that it did not assert in its complaint that First State was legally

Another claim arose during the overlap period, and that occurrence resulted in a lawsuit in an Oklahoma state court in which Hercules Bumpers is the defendant. In that action, John Wayne Reed alleges that Hercules Bumpers' negligent manufacture and design of a particular bumper caused an accident on April 7, 1983. Reed prays that he be awarded $750,000 as damages for the injuries that he suffered during that accident.

Hercules Bumpers notified First State of the Reed lawsuit and filed a claim under the excess insurance policy, but First State denied coverage. The declaratory judgment action, and First State's appeal, followed.

## II.

Hercules Bumpers argues that "Condition O" of the First State umbrella policy requires that Hercules Bumpers maintain the underlying primary policy or a renewal thereof in full force and effect throughout the April 1, 1983 to April 1, 1984 First State policy year, except for reductions in the aggregate limit of the Aetna policy as a result of occurrences taking place during the First State policy year. It further argues that "Provision III," which Hercules Bumpers interprets as requiring it to maintain the underlying coverage beyond the termination date of the excess policy, is ambiguous and conflicts with Condition O and, therefore, should be strictly construed against First State. In contrast, First State contends that its policy is not ambiguous; it requires the insured to maintain the underlying insurance and limits the excess insurer's liability in vivid language. Because the accident giving rise to the Reed claim did not occur until April 7, 1983, so First State's argument goes, Hercules Bumpers must initially seek indemnity from Aetna, and the amount paid by Aetna on that claim must exceed the underlying policy's limit before First State's coverage is triggered.

required to settle the Reed claim first, and was

## III.

An order awarding summary judgment is subject to independent review on appeal. *Morrison v. Washington County, Ala.*, 700 F.2d 678, 682 (11th Cir.1983). Accordingly, we will affirm such an order only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). In this case, the parties have stipulated to the material facts, and each moved for summary judgment. Our task, therefore, is to determine which party is entitled to judgment as a matter of law. That, in turn, depends on whether the First State policy is ambiguous under the circumstances of this case.

## IV.

 Georgia substantive law, which is controlling in this diversity action, *see Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), provides that a contract, including an insurance contract, must be examined as a whole when construing any portion thereof. *Nationwide Mutual Fire Ins. Co. v. Collins*, 136 Ga.App. 671, 676, 222 S.E.2d 828, 831 (1975). "The test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." *Id.*, at 675, 222 S.E.2d at 831. Any ambiguity must be construed strictly against the insurer, *Travelers Indemnity Co. v. Whalley Const. Co.*, 160 Ga.App. 438, 441, 287 S.E.2d 226, 229 (1981), but, where the terms and conditions of a policy are unambiguous, the court must declare the contract as made by the parties, *Genone v. Citizens Ins. Co.*, 207 Ga. 83, 86, 60 S.E.2d 125, 127 (1950). With these basic principles of contract law in mind, we turn to the question of the proper construction of the First State policy.

Two clauses of the First State policy are at the center of this dispute. Condition O provides:

not making that assertion on appeal.

It is warranted by the Insured that, the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restrictive in coverage, shall be maintained in force during the currency of this policy, except for any reduction in the aggregate limit(s) contained therein solely by payment of claims in respect of OCCURRENCES happening during the period of this policy. In the event of failure by the INSURED so to maintain such policy(ies) in force, the insurance afforded by this policy shall apply in the manner it would have applied had such policy(ies) been so maintained in force.

This provision describes Hercules Bumpers' obligation to maintain underlying insurance. Under its terms, the insured warrants that it will maintain the underlying insurance policy, or a renewal thereof, in full force and effect throughout "the currency of this policy" except for any reduction in the underlying policy's limit of liability arising out of occurrences happening "during the period of this policy." Thus, First State's status as the excess insurer is guaranteed; if Hercules Bumpers breaches its warranty, First State will not become the primary insurer.

■ The second clause at issue, Provision III, entitled "Limits of Liability," provides in part:

In the event that the aggregate limits of liability of the underlying policies, listed in the schedule of underlying insurance, are exhausted solely as the result of OCCURRENCES taking place after the inception date of this policy, this policy shall, subject to the Company's limit of liability and to the other terms of this policy, with respect to OCCURRENCES which take place during the period of this policy, continue in force as underlying insurance for the remainder of the policy year of the underlying policy or until the aggregate limit of liability as stated in Item 3 II is exhausted, but not for broader coverage than was provided by the exhausted underlying insurance.

In the event that the aggregate limits of liability of the underlying insurance are exhausted or reduced as the result of OCCURRENCES taking place prior to

the inception date of this policy, the Company shall only be liable to the same extent as if the aggregate limits had not been so exhausted or reduced.

As the heading preceding it denotes, Provision III limits First State's liability under the excess insurance policy. First State's contractual obligations arise only after the aggregate limit of liability of the underlying insurance is exhausted or reduced as the result of occurrences taking place "after the inception date of this policy." Insofar as the limit of liability of the underlying policy is reduced by occurrences taking place "prior to the inception date of this policy," First State's excess coverage is not implicated.

The parties to this appeal, the district court and, to a certain extent, the dissent offer differing interpretations of the seemingly simple expressions "during the currency of this policy" and "during the period of this policy," both of which appear in Condition O of the renewed excess policy, and "after the inception date of this policy," a phrase appearing in Provision III. The only reasonable construction of this plain language, however, is that all of these phrases refer to the First State policy year beginning April 1, 1983 rather than to the year immediately preceding that date, the span of time made the subject of the original excess insurance policy between Hercules Bumpers and First State. It is a basic tenet of insurance law that each time an insurance contract is renewed, a separate and distinct policy comes into existence. *E.g.*, 13A J. Appleman, Insurance Law and Practice § 7648 (rev. ed. 1976). Therefore, we hold that each time the parties to the renewed contract utilized the expression "this policy," words common to all three phrases, they intended to refer to the renewed First State policy.

■ Having so interpreted this language, our construction of the disputed provisions is as follows. Condition O mandates that Hercules Bumpers maintain the underlying Aetna policy, or a renewal thereof, in full effect throughout the year beginning April 1, 1983, except for reduc-

tions in the limit of liability of that policy arising out of occurrences happening during the year commencing April 1, 1983. First State's contractual obligation, according to Provision III, arises only after the aggregate limit of liability of the underlying insurance is exhausted as the result of occurrences taking place after April 1, 1983. Neither of the clauses are ambiguous when considered separately; each has a distinct purpose and the language utilized within each clause clearly describes that purpose. Moreover, the clauses are unambiguous when construed together. Condition O is a warranty given by Hercules Bumpers; it operates as a condition precedent to First State's liability. Provision III, on the other hand, sets forth certain limits on First State's liability.

That our construction of the First State policy leaves an 11 day period during which there may be a gap in coverage even if both policies are properly maintained and renewed must be admitted. This cannot cause us hesitation though because that is precisely the coverage the parties contracted for. The dissent seeks to avoid this allegedly harsh result and extend coverage to Hercules Bumpers by creating ambiguity where there is none. As the dissent recognizes, this eleven day period is a "necessary consequence" of the language utilized by the parties in Provision III. Hercules Bumpers knew or should have known on April 1, 1982 when it implemented excess coverage that the First State policy dates did not coincide with the dates of the Aetna policy then in force, and that if it renewed each policy on their respective anniversary dates, the gap would reoccur annually.

## V.

■ Viewed in light of the only reasonable construction that can be given the terms of the First State policy, we find no ambiguity and, therefore, no reason to liberally construe the policy in favor of the insured. Rather, we read the words of the policy literally and conclude that First State's coverage does not extend to the Reed claim since the triggering event of coverage, the exhaustion of the underlying policy's aggregate limits by occurrences happening after April 1, 1983, the inception date of the renewed First State policy, had not occurred prior to Hercules Bumpers' request for coverage for the Reed lawsuit. To accept any other construction and hold otherwise would obligate First State to provide greater coverage than called for by the contract as made by the parties. Accordingly, we REVERSE the order of the district court granting summary judgment to Hercules Bumpers against First State and REMAND with instructions that judgment be entered in favor of First State.

REVERSED AND REMANDED.

ANDERSON, Circuit Judge, dissenting:

Respectfully, I dissent. First State's position, adopted by the majority, ignores the conflict between Provision III and Condition "O" and thus fails to apply established Georgia law that such an ambiguity must be resolved in favor of coverage.

The two relevant policy provisions are Condition "O" and Provision III. Condition "O" provides in part:

O. *Maintenance of Underlying Insurance:* It is warranted by the Insured that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restrictive in coverage, shall be maintained in force during the currency of this policy....

Provision III provides in part:

In the event that the aggregate limits of liability of the underlying policies, listed in the schedule of underlying insurance, are exhausted solely as the result of OCCURRENCES taking place after the inception date of this policy, this policy shall, subject to the Company's limit of liability and to other terms of this policy, with respect to OCCURRENCES which take place during the period of this policy, continue in force as underlying insurance for the remainder of the policy year of the underlying policy or until the aggregate limit of liability as stated in Item 3.II is exhausted, but not

for broader coverage than was provided by the exhausted underlying insurance.

In the event that the aggregate limits of liability of the underlying insurance are exhausted or reduced as the result of OCCURRENCES taking place prior to the inception date of this policy, the Company shall only be liable to the same extent as if the aggregate limits had not been so exhausted or reduced.

First State argues that provision III means that during any particular policy year of the excess policy, if the aggregate limit of liability of the underlying policy is exhausted or reduced as a result of occurrences taking place before the beginning of that policy year, then the company will be liable only to the same extent as if the aggregate limit had not been so exhausted or reduced. I agree with First State, and the majority, that this is the most reasonable reading of the language of Provision III. Less obvious, however, is the necessary consequence of that language. What this language means is that whenever the policy dates of the underlying policy do not precisely coincide with the policy dates of the umbrella policy, the insured will be at risk of having reduced or even no underlying coverage during the overlap.[1] With this hidden risk revealed, it is clear that any non-foolhardy insured could satisfy his obligation to maintain underlying insurance only by maintaining an underlying policy

with policy dates that precisely coincide with the policy dates of the umbrella policy.

Obviously, Provision III gives rise to a result which is not only harsh, but a result which conflicts with a common sense understanding of the intention of the parties, i.e., that the parties intended that the underlying policy and the umbrella policy would dovetail and provide continuous coverage. Of course, a court is required to enforce the *unambiguous* terms of a policy even if the result is harsh and lacking in common sense. For the reason explained below, I need not address the question of whether or not the hidden risk in Provision III would itself render the policy language ambiguous.

Courts do not focus on a single provision of a contract, e.g., Provision III. Rather, courts are required to construe an insurance policy in light of all of its terms and provisions. Neither First State nor the majority has addressed the conflicting meaning of Condition "O." Condition "O" describes the insured's obligation to maintain underlying insurance. Under its terms, the insured can satisfy that obligation by maintaining "during the currency of [the First State] policy" the underlying policy listed in the schedule or a *renewal* thereof. By permitting renewals of the listed underlying policy during the First State policy period, Condition "O" expressly authorizes

---

1. Under Provision III, any payments of underlying insurance on account of occurrences *before* each policy year of the umbrella policy are excluded and are not taken into account in reaching the $500,000 point at which umbrella coverage is triggered. When the policy dates of the underlying and umbrella insurance do not precisely coincide, the previous underlying policy period and the new excess policy period will overlap for some amount of time each year. This may result in reduced coverage during the overlap, in the following fashion, even if both policies are maintained and renewed year after year.

At the point when the overlapping period begins, the underlying policy may be partially or fully exhausted. For example, in this case the relevant policy year of the underlying insurance ran from April 11, 1982 to April 11, 1983, and the relevant umbrella policy years were April 1, 1982 to April 1, 1983, and April 1, 1983 to April 1, 1984. The overlap period at issue was the eleven-day period between April 1, 1983 (the

beginning of the relevant policy year of the umbrella policy) and April 11, 1983 (the end of the relevant policy year of the underlying policy). Of the $500,000 aggregate annual coverage of the underlying policy, all $500,000 had already been used up by occurrences taking place by April 1, 1983. Under First State's interpretation of the policy, Hercules Bumpers thus had zero underlying coverage during this eleven-day period, because $500,000 was attributable to occurrences before the beginning of the particular policy year of the excess policy (i.e., April 1, 1983). Thus, the overlap is a period when, even if both policies are properly maintained and renewed, there is a gap in the insurance coverage.

Because this overlap period will recur each year, the risk of a gap in coverage during the overlap period will recur each year. The only way to eliminate this risk is to eliminate the overlap, i.e., to have underlying coverage with policy dates that precisely coincide with the policy dates of the umbrella policy.

an underlying policy whose policy dates do not coincide precisely with the policy dates of the First State umbrella policy. That is, a particular underlying policy which is maintained by renewal, during the umbrella policy period, will necessarily have policy dates that do not coincide with the policy dates of the excess policy period.

An insured therefore could reasonably conclude from reading Condition "O" that he would satisfy his obligation to maintain underlying insurance by means of a policy whose dates did not coincide precisely with the policy dates of the excess policy. Moreover, such an interpretation comports fully with common sense. There is nothing in common experience or business practice that would indicate to a reasonable insured that risk would be involved if the policy dates of an underlying policy do not coincide precisely with the policy dates of the excess policy, especially if both policies are maintained over the course of several years. To the contrary, common sense would indicate to a reasonable insured that he is adequately covered so long as he maintains during the entire relevant time period an underlying policy with the specified limits of liability.

Thus, Provision III requires that the only feasible way to maintain underlying insurance is by means of an underlying policy whose policy dates precisely coincide with the policy dates of the umbrella policy. By contrast, Condition "O" expressly permits an insured to satisfy his obligation to maintain underlying insurance by maintaining an underlying policy whose policy dates do not coincide with the policy dates of the excess policy. Under established Georgia law, these two conflicting provisions create an ambiguity, and the ambiguity must be resolved in favor of coverage. *See Cotton States Mutual Ins. Co. v. Crosby,* 149 Ga. App. 450, 254 S.E.2d 485, 487, *rev'd in part on other grounds,* 244 Ga. 456, 260 S.E.2d 860 (1979). *See generally Garmany v. Mission Ins. Co.,* 785 F.2d 941, 945 (11th Cir.1986) (ambiguities should be resolved in favor of finding coverage).

The insurance company argues that its interpretation of Provision III is bolstered by the underlined section of Condition "O":

O. *Maintenance of Underlying Insurance:* It is warranted by the Insured that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restrictive in coverage, shall be maintained in force during the currency of this policy *except for any reduction in the aggregate limit(s) contained therein solely by payment of claims in respect of OCCURRENCES happening during the period of this policy.*

It is far from clear that the underlined clause supports the company's position. First State reads this "except clause" to mean that payments from the underlying policy on account of occurrences happening during the period of the excess policy will not result in any reduction in excess coverage. By negative implication, the company argues, any other payments reducing the underlying limits (e.g., payments on account of occurrences *before* the umbrella policy period) would not count towards the $500,000 which triggers umbrella liability.

The insurance company's reading is flawed. First, as the district court pointed out, it is not clear whether "this policy" refers to the underlying policy or the umbrella policy. Second, Condition "O," to the extent First State's interpretation of the "except clause" is accepted, is itself ambiguous. The language permitting renewal of the underlying policy during the period of the umbrella policy expressly permits an insured to satisfy his obligation to maintain underlying insurance by maintaining a policy whose policy dates do not precisely coincide with the policy dates of the umbrella policy. But for the reasons already explained this would be impossible under the company's interpretation of the "except clause." The conflict between the two clauses would create an ambiguity, and under the established law, the clause providing coverage would be enforced.

In conclusion, I agree with the district court. I respectfully disagree with the majority's conclusion that the policy provi-

sions are unambiguous. Since Provision III and Condition "O" are in conflict, I would resolve the ambiguity in favor of coverage.