Argued and submitted January 8, decision of the Court of Appeals reversed; judgment of the circuit court affirmed April 8, 1993

Linda Diane PIERCE,
*Respondent on Review,*

*v.*

ALLSTATE INSURANCE COMPANY,
*Petitioner on Review.*

(CC 90-1515-L-1; CA A67513; SC S39392)

848 P2d 1197

Craig D. Bachman, of Lane Powell Spears Lubersky, Portland, argued the cause for petitioner on review. With him on the petition was Thomas W. Sondag.

Kelly L. Andersen, of Richardson & Andersen, P.C., Central Point, argued the cause for respondent on review and filed a response.

GRABER, J.

Van Hoomissen, J., dissented and filed an opinion in which Fadeley and Unis, JJ., joined.

Fadeley, J., filed a separate dissenting opinion.

**GRABER, J.**

ORS 742.502 provides for the issuance of uninsured and underinsured motorist liability coverage:

"(1) Every motor vehicle liability policy insuring against loss suffered by any natural person resulting from liability imposed by law for bodily injury or death arising out of the ownership, maintenance or use of a motor vehicle shall provide uninsured motorist coverage therein or by indorsement thereon when such policy is either:

"(a) Issued for delivery in this state; or

"(b) Issued or delivered by an insurer doing business in this state with respect to any motor vehicle then principally used or principally garaged in this state.

"(2) The insurer issuing such policy shall offer one or more options of uninsured motorist coverage larger than the amounts prescribed to meet the requirements of ORS 806.070[, set out in note 1, *infra,*] up to the limits provided under the policy for motor vehicle bodily injury liability insurance. Offers of uninsured motorist coverage larger than the amounts required by ORS 806.070 shall include underinsurance coverage * * *. Underinsurance benefits shall be equal to uninsured motorist coverage benefits less the amount recovered from other automobile liability insurance policies."

The issue in this case is whether ORS 742.502(2) required defendant insurance company to offer plaintiff "options of uninsured motorist coverage * * * up to the limits provided under the policy for motor vehicle bodily injury liability insurance" every time that plaintiff added vehicles to her automobile liability insurance policy, deleted vehicles, or replaced vehicles named in the policy with other vehicles. The trial court held that ORS 742.502(2) did not require such offers and granted summary judgment for defendant. Plaintiff appealed; the Court of Appeals reversed. *Pierce v. Allstate Ins. Co.*, 112 Or App 530, 829 P2d 1032 (1992). We reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

The material facts are not in dispute. Plaintiff purchased an automobile liability insurance policy from defendant in 1985. The policy covered a 1981 Datsun and a 1985 Ford. When plaintiff obtained the policy in 1985, defendant

offered plaintiff "optional" uninsured motorist liability coverage in an amount up to $100,000, the amount of bodily injury liability coverage provided in the policy. That offer complied with the requirements of ORS 742.502. Plaintiff did not accept the offer. As a result, the policy issued to her included uninsured motorist coverage in the amount of $25,000 per person, the minimum amount required by ORS 742.502(1), 806.060(1), and 806.070(2)(a).[1]

In May 1986, plaintiff deleted the Ford from the policy. In September 1986, she added a 1965 Chevrolet. In January 1987, she deleted the Datsun and added a 1986 Isuzu. As issued by defendant, plaintiff's policy permitted those additions, deletions, and replacements as modifications to the existing policy.[2] Defendant did not offer optional uninsured motorist coverage to plaintiff on any of those occasions.

In March 1988, while standing on her front porch, plaintiff was severely injured by a car driven by an underinsured motorist. The underinsured motorist's insurer paid

---

[1] ORS 806.060(1) provides:

"A person who is required to comply with the financial responsibility requirements of this state must be able to respond in damages, in amounts required under this section, for liability on account of accidents arising out of the ownership, operation, maintenance or use of motor vehicles * * *.

"(1) To meet the financial responsibility requirements, a person must be able to respond in damages in amounts not less than those established under * * * ORS 806.070."

ORS 806.070(2)(a) provides:

"The schedule of payments is as follows:

"(a) $25,000 because of bodily injury to or death of one person in any one accident[.]"

[2] Under "Part I - Automobile Liability Insurance," the insurance policy contained the following explanation of what constituted an insured vehicle:

"**Insured Autos**

"(1) Any **auto** described on the declarations page and the four wheel private passenger **auto** or **utility auto you** replace it with.

"(2) An additional four wheel private passenger **auto** or **utility auto you** acquire ownership of during the premium period. This **auto** will be covered if **we** insure all other private passenger **autos** or **utility autos you** own. **You** must, however, notify **us** within 60 days of acquiring the **auto** and pay any additional premium." (Bold emphasis in original.)

Under "Part III - Uninsured Motorists Coverage," the policy stated in part:

"**An insured auto is a motor vehicle:**

"(1) described on the declarations page, and the **motor vehicle you** replace it with.

plaintiff $50,000, which was less than her total damages. Plaintiff brought a declaratory judgment action against defendant, seeking to determine her rights under ORS 742.502 and the insurance policy. She asserts that ORS 742.502(2) required defendant to have offered her optional uninsured motorist liability coverage in the amount of $100,000, the bodily injury liability limit under her policy, each time she deleted automobiles from, replaced, or added automobiles to her policy and that, because defendant had not done so, she is entitled to coverage in the amount of $100,000.

■   The question before us is whether the deletion, replacement, or addition of a vehicle is an event requiring an offer of optional uninsured motorist coverage under ORS 742.502(2). In interpreting a statute, our task is to discern the intent of the legislature. ORS 174.020; *State ex rel Juv. Dept. v. Ashley*, 312 Or 169, 174, 818 P2d 1270 (1991). We begin with the text and context of the statute; other provisions of the same statute are part of that context. ORS 174.010; *Sanders v. Oregon Pacific States Ins. Co.*, 314 Or 521, 840 P2d 87 (1992).

ORS 742.502(1), set out on page 33, states that a motor vehicle liability policy insuring against loss from liability for bodily injury must provide a minimum amount of uninsured motorist coverage when the policy is "[i]ssued." ORS 742.502(2) states that the insurer must also offer "options of uninsured motorist coverage larger than" that minimum, up to the limits of the liability policy; however, it does not state when that offer must be made. Construing ORS 742.502(1) and (2) together, we conclude that ORS 742.502(2) requires that an insurer offer optional uninsured motorist coverage at the time the policy is "issued."

■   We then reach the question whether the addition of a vehicle to a policy, the deletion of a vehicle, or the replacement of one insured vehicle with another under the same policy constitutes "issuance" of a policy within the meaning of ORS

---

"(2) **you** acquire ownership of during the premium period. This additional **motor vehicle** will be covered if **Allstate** insures all other private passenger **motor vehicles you** own. **You** must, however, notify **Allstate** within 60 days after **you** acquire the **motor vehicle** and pay any additional premium." (Bold emphasis in original.)

742.502(2).[3] Several sections of the Insurance Code demonstrate that the answer is "no."

■ The Insurance Code does not contain an explicit definition of "issuance." "Policy" is defined, however, in ORS 731.122:

> " 'Policy' means the written contract or written agreement for or effecting insurance, by whatever name called, and *includes all clauses, riders, indorsements and papers* which are a part thereof and annuities." (Emphasis added.)

That definition implies that a single "policy" may include multiple riders and indorsements, which often are incorporated after the issuance of the policy. *See also* ORS 742.458 (with respect to motor vehicle liability insurance policy, "[t]he policy, the written application therefor, if any, and any rider or indorsement * * * shall constitute the entire contract").

Other statutes suggest that a "policy" generally is "issued" only once, in response to an application by the prospective insured. Under ORS 742.013, the insured's statements in an application for an insurance policy are "deemed to be representations." Misrepresentations, omissions, concealments of fact, and incorrect statements prevent recovery under "the policy" only if they are "contained in *a written application for the insurance policy*, and a copy of the application is indorsed upon or attached to *the* insurance policy *when issued.*" *Ibid.* (emphasis added). ORS 742.046 requires that every policy "be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time *after its issuance* except where a condition required by the insurer has not been met by the insured." (Emphasis added.) *See also* ORS 742.026 (two or more insurers may jointly "issue" certain underwriters' and combination policies).

■ The statutory scheme also makes clear that the renewal of a motor vehicle liability policy for an additional period does not constitute the issuance of a new policy. ORS

---

[3] The parties' automobile liability insurance policy treated the addition, deletion, and replacement of insured vehicles as amendments to one ongoing policy, and plaintiff does not argue otherwise. The question before us is, however, one of statutory construction, not one of construction of the insurance policy.

742.560(2), which relates to cancellation and nonrenewal of automobile liability insurance policies, provides in part:

> " 'Renewal' or 'to renew' means to continue coverage for an additional policy period upon expiration of the current policy period of *a policy.*" (Emphasis added.)

Unless "a policy" is canceled or nonrenewed by the statutorily required method, it continues. ORS 742.560 to 742.570. More generally, and to similar effect, ORS 742.051 provides:

> "Any insurance policy terminating by its terms at a specified expiration date and not otherwise renewable, may be renewed or extended at the option of the insurer, if renewed or extended upon a currently authorized policy form at the premium rate then required therefor, for a specific additional period or periods by certificate or by indorsement of the policy, *without requiring the issuance of a new policy.*" (Emphasis added.)

That is, any insurance policy may be renewed or extended "without requiring the issuance of a new policy."

Finally, and most directly relevant to plaintiff's specific claim here, ORS 742.504(2)(b) defines the term "insured vehicle" in the context of uninsured and underinsured motorist coverage as follows:

> "As used in [an uninsured motorist liability] policy:
>
> "* * * * *
>
> "(b)  'Insured vehicle,' * * * means:
>
> "(A)  The vehicle described in the policy *or a newly acquired * * * vehicle,* * * * insured under the * * * provisions of *the policy*[.]" (Emphasis added.)

We interpret the text of ORS 742.504(2)(b)(A) to mean that the addition of a vehicle to a policy, the deletion of a described vehicle, or the replacement of one vehicle by another under the same policy does not constitute issuance of a policy in the context of uninsured and underinsured motorist coverage. That is, the statute contemplates that vehicles may be added, deleted, or replaced as modifications to an existing, ongoing insurance policy.

■　　　　Reading the relevant provisions of the uninsured motorist statute and Insurance Code together,[4] we conclude that, when plaintiff added vehicles to the motor vehicle liability insurance policy issued to her by defendant, deleted vehicles, or replaced vehicles insured under that policy with other vehicles, defendant was not required, under ORS 742.502(2), to offer plaintiff "options of uninsured motorist coverage larger than" the minimum amounts provided. Rather, ORS 742.502(2) requires that an offer be made when an insurer initially issues a policy to an insured.[5]

■■　　　Although we do not agree with the holding below in the present case, we agree with the Oregon Court of Appeals' statement that ORS 742.502 (formerly ORS 743.789) was intended "to provide Oregon drivers an affirmative choice whether to obtain more than minimum protection against uninsured [and, by later statutory amendment, underinsured] motorists." *White v. Safeco Insurance Co.*, 68 Or App 11, 15, 680 P2d 700 (holding that an insurer has an affirmative duty to communicate expressly to insureds the availability of optional additional uninsured coverage), *rev den* 297 Or 492 (1984). We also agree with the Court of Appeals that,

> "once an insured has been made aware that the coverage is available, an insurer is not obligated, as the trial court aptly put it, to inquire continuously whether the insured really meant to refuse. Plaintiff has not asserted that defendant's notice in April, 1982, was not adequate and, having once given it, defendant was not required to provide notice again."
> (Footnote omitted.)

*Wood v. State Farm Mutual Automobile Ins. Co.*, 100 Or App 576, 580, 787 P2d 504 (holding that new offers were not required to be made concurrently with renewals of policy over three-year period after the insurer gave the statutorily required offer), *rev den* 310 Or 133 (1990).

The case is not, as Justice Van Hoomissen's dissent would have it, one in which the two possible answers are evenly balanced, so that the scales are tipped by resort to a

---

[4] Legislative history is not of assistance.

[5] We need not decide in this case whether the structure and purpose of ORS 742.502(2) require that a reoffer of optional uninsured motorist coverage be made when an insurer offers, or an insured selects, an increase in the insured's motor vehicle bodily injury liability coverage.

general principle of "liberal construction." 316 Or at 44, 51. This case is, instead, one in which the *statutory context* compels the answer. The dissent fails to consider the implications of the pertinent portions of the Insurance Code, discussed above, which demonstrate the relevant legislative intent.

The parties and Justice Van Hoomissen's dissent cite cases from other jurisdictions in support of their positions. Those cases are of limited persuasive value, because they involve different statutes, different facts, inapposite holdings, or a combination of those things. We note, however, that many cases from other jurisdictions support our conclusion.[6]

We also note that the dissent cites 13A Appleman, Insurance Law and Practice § 7648 (1976 ed). 316 Or at 46. In the cited section, entitled "Renewal as Continuation, or as New Certificate," the author states:

> "A renewal contract has been stated *by many jurisdictions* to be a new, and a separate and distinct contract, *unless the intention of the parties is shown clearly that the original and renewal agreements shall constitute one continuous contract.*" *Id.* at 450-51 (footnote omitted; emphasis added).

---

[6] *See, e.g., Mouton v. Guillory*, 494 So 2d 1374 (La App 1986) (an insurer who issues a renewal or substitute policy need not present the insured with the option of rejecting uninsured motorist coverage); *Moore v. Young*, 490 So 2d 519 (La App 1986) (increase in amount of liability coverage was a "renewal policy," to which limit of uninsured motorist coverage, selected seven years earlier, continued to apply); *Hoskins v. State Farm Mut. Auto. Ins. Co.*, 26 Ohio St 3d 87, 497 NE2d 87 (1986) (insurer was not required to reoffer underinsured motorist coverage upon reinstating policy, where insured had rejected such coverage before allowing policy to lapse and where policy was reinstated upon payment of premium without filing of new application); *Makela v. State Farm Mut. Auto. Ins. Co.*, 147 Ill App 3d 38, 497 NE2d 483 (1986) (Illinois statute does not require new offer of uninsured motorist coverage when policy is renewed; addition of vehicle constitutes renewal of policy). *Cf. El-Habr v. Mountain States Mut. Cas. Co.*, 626 SW2d 171 (Tex App 1981) (indorsement to existing insurance policy, which added new vehicle, did not give rise to new policy). *See also Allstate Ins. Co. v. Parfrey*, 830 P2d 905 (Colo 1992) (noting that amended Colorado statute provides that, where insured has declined uninsured motorist coverage, insurer need not reoffer that coverage when vehicle insured under policy changes or when policy is reinstated, transferred, substituted, amended, altered, modified, replaced, or renewed); *Metro. Property and Liability Ins, Co. v. Gray*, 446 So 2d 216 (Fla App 1984) (revised Florida statute provides that new offer of uninsured motorist coverage need not be made in connection with an amendment or indorsement to an existing policy); Annot, *Construction of Statutory Provision Governing Rejection or Waiver of Uninsured Motorist Coverage*, 55 ALR3d 216, § 7.5 (1992 Supp) (collecting cases in respect to when renewal of offer of uninsured motorist coverage must be made and showing a split of authorities).

Here, as demonstrated above, the *legislature* has "shown clearly that the original and renewal agreements shall constitute one continuous contract."

In conclusion, we hold that summary judgment for defendant was proper.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**VAN HOOMISSEN, J.,** dissenting.

The majority frames the issue in this case as follows:

"[W]hether ORS 742.502(2) required defendant insurance company to offer plaintiff 'options of uninsured motorist coverage * * * up to the limits provided under the policy for motor vehicle bodily injury liability insurance' every time that plaintiff added vehicles to her automobile liability insurance policy, deleted vehicles, or replaced vehicles named in the policy with other vehicles." 316 Or at 33.

I reject that formulation.

I would frame the issue as follows:

On the undisputed facts presented in this case, did ORS 742.502(2) require defendant insurance company (Allstate) to offer plaintiff "options of uninsured motorist coverage * * * up to the limits provided under the policy for motor vehicle bodily injury liability insurance" after December 30, 1985 but before she was injured in March 1988?[1]

Because by 1988, the coverage under plaintiff's insurance contract was for entirely different vehicles than those insured in 1985, and the scope of coverage had been materially altered, I would answer that question "yes." Accordingly, I would affirm the decision of the Court of Appeals, although my rationale differs.[2]

---

[1] I agree with the majority that ORS 742.502(2) requires that an insurer offer optional uninsured motorist (UM) coverage at the time an automobile insurance contract is first executed. The question presented in this case, however, is when, if ever, a new offer must be made.

[2] Allstate does not challenge the amount of UM coverage to which plaintiff is entitled if Allstate failed to comply with ORS 742.502(2). Allstate challenges only the Court of Appeals' holding that it was required to make plaintiff a new offer of UM protection when there was coverage of a "new risk."

Before December 30, 1985, plaintiff was insured by Allstate. On December 30, 1985, Allstate sent plaintiff a Declarations page and billing statement for insurance on her Datsun and Ford. The contract provided collision and comprehensive coverage on the Ford, but not on the Datsun. The premiums due were $63.80 for the Datsun, and $152.00 for the Ford, based on plaintiff's representation to Allstate that the Datsun was to be used for "work" and the Ford was to be used for "pleasure." "Good driver" and "multiple car" discounts were given. The contract and premium period began on January 27, 1986, "with no fixed date for expiration." The following language appeared on that document:

> "Uninsured motorist's limits equal to your bodily injury limits are offered to you at the following prices: Veh 1 $13.00 Veh 2 $11.10. See enclosed coverage update describing this offer and how to accept or reject it or obtain other available limits."

Plaintiff did not accept Allstate's offer.

Between December 30, 1985, and March 28, 1988, when plaintiff was injured, she continued to be insured by Allstate. She received several Declarations pages and billing statements from Allstate during that period. Those documents show the following changes in plaintiff's coverage:

On March 7, 1986, Allstate issued a Declarations page and billing statement that changed the contract by deleting coverage on the Datsun and increasing the premium due on the Ford from $152.00 to $179.80. That document reads in part:

> "EFFECTIVE ON FEB 6, 1986, YOUR POLICY WAS CHANGED FOR
>
> "THE DELETION OF ONE OR MORE VEHICLES
> "MULTIPLE CAR DISCOUNT NO LONGER APPLIES
> "A CHANGE IN DRIVER OR USE CLASS OF VEHICLE NO. 1
>
> "PRIOR TO THIS CHANGE, YOUR ACCOUNT PREMIUM WAS $215.80
> "YOUR NEW ACCOUNT PREMIUM, ITEMIZED BELOW IS $179.80
>
> "* * * * *

"THIS CHANGE CAUSED A PREMIUM DECREASE OF $33.60 FOR THE PERIOD FEB 06, 1986 TO JUL 27, 1986 * * *."

On May 5, 1986, Allstate issued another Declarations page that changed the contract by deleting coverage on the Ford and adding coverage on the Datsun. Collision and comprehensive coverage were added for the Datsun. The contract and premium period was changed from "no fixed date of expiration" to "Jul 27, 1986." All subsequent coverage was for a fixed period.[3]

On June 30, 1986, Allstate issued another Declarations page and billing statement that insured only the Datsun for an increased premium of $186.80.

On September 15, 1986, Allstate issued another Declarations page and billing statement that changed the contract by adding coverage on a Chevrolet. The Chevrolet was not insured for collision and comprehensive coverage. The premiums due were $63.00 for the Chevrolet and $157.80 for the Datsun. A "multiple car" premium discount was added. Allstate did not offer UM limits equal to plaintiff's bodily injury limits when the Chevrolet was added to the contract, nor did Allstate quote a specific price for such coverage on the Chevrolet.

On January 16, 1987, Allstate issued another Declarations page and billing statement insuring the Datsun and the Chevrolet and charging premiums of $169.00 and $71.20, respectively, based on plaintiff's representation to Allstate that the Chevrolet was to be used for "work" and the Datsun was to be used for "pleasure."

On January 30, 1987, Allstate issued another Declarations page and billing statement that changed the contract by adding coverage on an Isuzu and deleting coverage on the Datsun. Only the Isuzu was insured for collision and comprehensive coverage. Allstate charged a premium of $185.00 for the Isuzu, in place of the $169.00 premium for the Datsun,

---

[3] The contract provides that the insured may cancel coverage at any time by giving Allstate written notice. On giving written notice, Allstate may cancel for any reason during the first 60 days, and thereafter during the period of coverage on certain grounds. Allstate is under no contractual obligation to renew the contract or to issue a new contract at the end of the premium period.

based on plaintiff's representations to Allstate that the Chevrolet was to be used for "work" and the Isuzu was to be used for "pleasure." That document reads in part:

"EFFECTIVE ON JAN 27, 1987, YOUR POLICY WAS CHANGED FOR

"A CHANGE IN DESCRIPTION FOR VEHICLE NO. 1.
"A CHANGE IN LIENHOLDER FOR VEHICLE NO. 1.
"A CHANGE IN DRIVER OR USE CLASS OF VEHICLE NO 1.

"PRIOR TO THIS CHANGE, YOUR ACCOUNT PREMIUM WAS $240.20.
"YOUR NEW ACCOUNT PREMIUM, ITEMIZED BELOW, IS $256.20."

In addition to the "good driver" and "multiple car" discounts previously given from time to time, that document shows that an "economy car" discount was added. That document also contained the same language as the January 16, 1987, document, emphasizing a "change" in the contract and calling attention to new balances and payment notices. Allstate did not, however, offer UM limits equal to plaintiff's bodily injury limits on the Isuzu, nor did it quote a specific premium for such coverage on the Isuzu.

Additional Declarations pages and billing statements were issued by Allstate in June and December 1987. Neither of those documents included an offer of UM limits equal to plaintiff's bodily injury liability limits on the Chevrolet or the Isuzu, even though such coverage had never been offered on either of those cars, and no premium had ever been quoted for such coverage on either of those cars.

Thus, it is undeniable that the contract in effect on December 30, 1985, was *materially different* from the contract in effect in March 1988. I believe that the changes shown by the facts presented in this case were material enough that the contract in effect in March 1988 cannot fairly be described as a "renewal" of the December 1985 contract. Rather, a "new" contract was created before plaintiff was injured.

The question is: *When* must an offer of UM coverage be made?[4] Public policy favors the indemnification of victims of negligent, financially irresponsible motorists. ORS 742.502(2) is remedial in nature and should be liberally construed in order to carry out the legislature's intent to give an insured an opportunity to provide the intended protection in an amount above the mandatory minimum protection required by law. *See* ORS 731.008 (purpose of Insurance Code is protection of insurance-buying public); ORS 731.016 (insurance code shall be liberally construed). Construing the statute liberally, I would hold that when a material change is made in an existing automobile insurance contract, such as is true in this case, the insurer is obligated to renew the offer of UM coverage that the statutes mandate must be offered to the purchaser of a new automobile insurance contract, even though the insured previously has rejected such coverage. In ascertaining legislative intent, I look not only to the language of the statute, but also to the object sought to be accomplished by the legislature and the wrong to be remedied.

In *Bowsher v. State Farm Fire Co.*, 244 Or 549, 552, 419 P2d 606 (1966), this court stated:

> "The trial court held that the legislative intent in requiring certain insurance policies to provide protection for policyholders injured by operators of 'uninsured motor vehicles' should be liberally construed to the end that persons injured by uninsured motorists be protected to the limits of such policies to the same extent that they would have been protected if the tortfeasors had carried insurance. We agree."

In *Peterson v. State Farm Ins. Co.*, 238 Or 106, 111-12, 393 P2d 651 (1964), this court stated:

> "The basic purpose of the uninsured motorist provision seems clear. It provides protection for the automobile insurance policyholder against the risk of inadequate compensation for injuries or death caused by the negligence of financially irresponsible motorists. In other words, the legislative purpose in creating compulsory uninsured motorist coverage was to place the injured policyholder in the same

---

[4] I agree with the majority that the Insurance Code does not contain an explicit definition of "issuance," and that legislative history is of no assistance in construing this statute.

position he would have been in if the tortfeasor had had liability insurance." (Citations omitted.)

The majority interprets ORS 742.504(2) to mean that, in the context of uninsured and underinsured motorist coverage, the facts in this case do not show the *issuance* of a new contract.[5] Accordingly, the majority holds that Allstate was not required to reoffer plaintiff options of uninsured motorist coverage in 1986 and 1987. That holding lacks any persuasive analysis or citation to authority and is little more than mere *ipse dixit*.[6] That interpretation of the statute is not compelled by any language in the statute or by statutory context. Nor is it compelled by any social policy. The majority's suggestion that the "implications of the pertinent portions of the Insurance Code * * * demonstrate the relevant legislative intent," lacks persuasive analysis. Moreover, the majority's assertion that "many cases from other jurisdictions support our conclusion," 316 Or at 39, is not supported by the cases cited, not one of which involved comparable facts and/or a similar statute.

The record in this case and the cases cited by the parties suggest that some insurers keep the same contract with their insured "with no fixed date of expiration," so long as the relationship of insurer-insured continues, adding and/or deleting vehicles and changing coverage and/or premiums as necessary. Other insurers apparently issue a new contract, with amendments as necessary, at the expiration of each

[5] The majority observes that the insurance contract "permitted those additions, deletions, and replacement as modification to the existing policy." 316 Or at 34. I fail to see the relevancy of those contract provisions in interpreting ORS 742.502(2). As the majority itself recognizes, the question is one of statutory construction, not one of construction of the insurance policy. It simply cannot be true that the legislature intended to delegate *to insurers* the power to decide when the duty to offer UM coverage is triggered.

[6] The majority cites the definition of "policy" found in ORS 731.122 to support its conclusion that the insurer never "issued" a contract on plaintiff's Chevrolet or Isuzu. That statute, and ORS 742.458, may indeed stand for the proposition that a rider or indorsement should be considered a part of an ongoing contract. However, those statutes in no way indicate that an insurance contract covering an entirely different period of time and entirely different vehicles should be considered a rider or indorsement to an earlier contract. Nor does the majority's list of other statutes that have used variations on the word "issue" provide any support for its position. 316 Or at 35-36. The majority's analysis puts no limitation on what might be considered an indorsement or rider, and could lead to situations where a new contract is never "issued," unless a party changes insurers.

contract and premium period. Under the majority's holding, a person insured by a "same contract insurer" would *never* be entitled to a reoffer of "options of uninsured motorist coverage" regardless of what changes were made in the contract between the parties, whereas a person insured by a "new contract insurer" would be entitled to an offer of such coverage each time a new policy was issued, even if no changes were made. It is inconceivable to me that the legislature ever intended to make the operation of the duty created by ORS 742.502(2) depend on how any insurer chooses to process its paperwork.

Generally, each time an insurance contract is renewed, a separate and distinct contract comes into existence unless there is clear evidence that the parties intended one continuous contract. *See* 13A, Appleman, Insurance Law and Practice § 7648 (rev ed 1976 Supp 1992) ("a renewal contract has been stated by many jurisdictions to be a new, and a separate and distinct contract, unless the intention of the parties is shown clearly that the original and renewal agreement shall constitute one continuous contract").[7]

One may ask: How much can a contract be changed before it becomes a new contract? In this case, I would hold that a new contract was executed after 1985 and before plaintiff's injury. Allstate's duty to offer uninsured motorist coverage *in 1985* was discharged under that contract, but Allstate was not relieved of the duty to make another such offer when a new contract was issued after 1985.

I read the majority opinion to hold that an insurer need not renew an offer of ORS 742.502(2) coverage regardless of the number or type of vehicles added or dropped from a contract, changes in the coverage for each vehicle, changes in discounts given or canceled, changes in premiums for each vehicle, changes in use class for each vehicle, or changes in the contract period, *i.e.*, no fixed date of expiration versus a fixed

---

[7] *See also Hercules Bumpers, Inc. v. First State Ins. Co.*, 863 F2d 839, 842 (11th Cir 1989) (generally, each time an insurance contract is renewed, a separate and distinct policy comes into existence); *Industro Motive Corp. v. Morris Agcy. Inc.*, 76 Mich App 390, 256 NW2d 607 (1977) (same); *Russell v. State Farm Mutual Automobile Ins. Co.*, 47 Mich App 677, 209 NW2d 815, 817 (1973) (same); *Harrington v. Aetna Casualty and Surety Company*, 489 SW2d 171, 176 (Tex Civ App 1972) *error refused* (1973) (same).

date. In many cases, that interpretation eventually would make the "shall issue" language of the statute meaningless. In my view, that interpretation is contrary to the public policy considerations that underscore the enactment of our UM statutes. The statute should be broadly construed to accomplish its purpose, rather than narrowly construed, as done by the majority, to limit the insurer's duty to the time when the insured "initially" enters into an automobile insurance contract.

Moreover, my research persuades me that the majority result is contrary to the recent relevant holdings of several jurisdictions.

It is appropriate to make a selective examination of those holdings, because it is possible to identify those states that have adopted identical or substantially similar legislation to ORS 742.502(2) and because almost all litigation in this area involves standard coverage provisions.

For example, 3 Widiss, Uninsured and Underinsured Motorist Insurance 18, § 32.5 (2d ed 1992), states:

"When *a significant change* is made in an existing coverage — *such as* the addition of a person identified as a named or designated insured or *the addition of a vehicle* — in several states the courts have held that the insurer is obligated to renew the offer of underinsured motorist coverage in the amount mandated by the applicable legislation (which is usually the amount of the coverage limits selected for the liability coverage). In essence, this means that *when an original insurance policy is changed in any material respect*, the insurer is required to provide the insured with an opportunity to reject the level of coverage which the statute mandates must be offered to the purchaser of a new policy even though the insured has previously rejected such coverage." (Emphasis added; footnote omitted.)

In *State Farm Mut. Auto. Ins. Co. v. Arms*, 477 A2d 1060 (Del Supr 1984), the Supreme Court of Delaware construed its comparable statute to impose a duty to offer additional uninsured motorist coverage whenever a new contract, other than a renewal, is issued. The court explained:

"[W]e conclude that the plain language of [Del C § 3902(b)] imposed a duty [on the insurer] to offer additional uninsured motorist coverage whenever a new policy, other than a

renewal, is issued. * * * The statute clearly contemplates that *a renewal is merely the automatic continuation of the preceding policy, identical in form and substance, except as to date, and perhaps, premium.* Citing J. Appleman, Insurance Law and Practice, § 7648, at 422 (1943 & Supp 1976). It is the change in the basic legal relationships between the parties which connotes a new policy, rather than a renewal, and thus triggers the offer requirement [of the statute].

"* * * * *

*"These were not minor changes. They were substantive, and the passage of over fourteen months since the option for additional coverage was first explained to plaintiff indicates the importance of reminding the insured that such protection was available."* 477 A2d at 1064-65 (emphasis added).

As noted, in this case it is undeniable that the insurance contract in effect on December 30, 1985, was not identical in form and substance with the contract in effect in March 1988; rather, it was *materially different*. There were numerous major substantive changes in the contract over a period of more than 26 months.

In *Fireman's Fund Ins. Co. v. Pohlman*, 485 So 2d 418, 420-21 (Fla 1986), in the context of interpreting a statute permitting "stacking" of UM coverage, the Supreme Court of Florida stated:

"In [*United States Fire Insurance Co. v.*] *Van Iderstyne*, [347 So 2d 672 (Fla 1977),] the court determined that the addition of an automobile to an existing policy of insurance along with an additional premium constituted a separate and severable contract issued on the date of the endorsement. Similarly, *we now hold that, under the facts of this case, the addition of an automobile to an existing policy of insurance along with an additional premium constitutes a separate and severable contract of insurance."* (Emphasis added.)

In this case, several different vehicles were added to and deleted from the contract in 1986 and 1987, and the premiums due were adjusted accordingly. Moreover, the type of coverage and use class on some vehicles were changed.

In *Beauchamp v. Southwestern Nat. Ins. Co.*, 746 P2d 673, 676 (Okla 1987), the Supreme Court of Oklahoma stated:

"[R]espondents sought insurance for a vehicle separate and distinct from those initially insured under the August 13,

1983, policy issued by petitioner. The vehicle was not a substitute for one of those insured under the original policy. Petitioner required the payment of an additional premium to effectuate coverage of the additional vehicle. *Thus the coverage of the 1974 Jeep had both an object of insurance and premium for that insurance distinct from the original policy. This would clearly appear to constitute a material change from the original policy for which uninsured motorist coverage was rejected.*

"In 36 O.S.1981 § 3636(F), the Legislature has set forth a narrow pronouncement which relieves insurers from the burden of procuring a written rejection of uninsured motorist coverage whenever an existing policy is renewed. This pronouncement, however, must be viewed in the context of the explicitly announced legislative policy set forth at 36 O.S.1981 § 3636(A) which is that uninsured motorist coverage *must* be offered with each policy of insurance. To give full effect to the overall policy of section 3636 the provision of subsection (F) must be viewed as strictly limited to true renewals of existing insurance policies, that is, situations where such renewals are made without effecting a material change or departure from the provisions of the original policy.

"In furtherance of the policy of section 3636, we now adopt the view espoused by the dissent in *Hicks [v. State Farm Mutual Automobile Insurance Company*, 468 P2d 629 (Okla 1977)], and find that *the coverage of the 1974 Jeep constituted a policy distinct from that issued by petitioner on August 13, 1983. As such the mandate of 36 O.S.1981 § 3636(A), required that uninsured motorist coverage be offered in conjunction with the coverage of the 1974 Jeep.* Petitioner's failure to offer uninsured motorist coverage with the new policy, and the attendant failure to obtain a written rejection required by 36 O.S.1981 § 3636(F), resulted in the inclusion of uninsured motorist coverage as part of the policy by operation of law." (Emphasis added.)

In reaching its conclusion, the Supreme Court of Oklahoma observed:

"[T]he Supreme Courts of Delaware, and Florida, have recently indicated that a new policy of insurance results where different vehicles with different coverages and/or premiums are added to existing policies [citing *State Farm Mut. Auto. Ins. Co. v. Arms, supra*, and *Fireman's Fund Ins. Co. v. Pohlman, supra*]." 746 P2d at 675.

In *Lucky v. Equity Mut. Ins. Co.*, 259 Ark 846, 537 SW2d 160 (1976), the Supreme Court of Arkansas held that where, after the insured had rejected UM coverage, the insurer issued an endorsement for a substitute vehicle, the rejection of UM coverage was not effective as to the coverage provided under the endorsement. That court explained:

"Our interpretation of the uninsured motorist statute here follows the statutory construction rule that where the enacting clause of a statute is general in its language and purpose, a proviso subsequently following should be construed strictly so as to exempt no cases from the enacting clause which do not fairly fall within its terms, *McRea v. Holcomb*, 46 Ark 306 (1885). *To accept the construction which appellee would have us place on the uninsured motorist statute would permit one rejection to be effective for any and every automobile that might be substituted by the insured for the original vehicle. Such a construction should not be placed upon a public policy statute that expects uninsured motorist coverage to be issued or rejected any time automobile liability insurance is 'delivered or issued for delivery in this State.'* " 537 SW2d at 162 (emphasis added).

In *Knight v. State Farm Mut. Auto. Ins. Co.*, 297 SC App 20, 374 SE2d 520, 522 (1988), *cert den* 298 SC 203 (1989), the South Carolina Court of Appeals stated:

*"The general rule is that the renewal of a policy of insurance for a fixed term is in effect a new contract and must contain all the essentials of a valid contract.* This is so even though the parties' renewal contract continues in force the terms of the expiring contract and no new policy of insurance is issued. The exception to these general rules is where the renewal is consumated [*sic*] in pursuance of a provision in the expiring policy. In such instance the renewal is an extension of the old contract." (Emphasis added; citations and footnote omitted.)

In *Tucker v. Country Mut. Ins. Co.*, 125 Ill App 3d 329, 465 NE2d 956, 959 (1984), in interpreting that state's corresponding statute, the Illinois Court of Appeals stated:

"Although the question is not entirely free from doubt, we interpret section 143a-1 to require that insurers offer the optional [uninsured motorist] coverage in definite and specific terms *in renewal policies* and original policies so as to make effective, what is to us, the insured's clear power of acceptance of the additional coverage." (Emphasis added.)

*See also American Universal Insurance Co. v. Russell*, 490 A2d 60, 62 (RI 1985) (statute pertaining to offers of uninsured motorist coverage required that the insurance company reoffer uninsured motorist coverage upon renewal of the contract); *Gaar v. Sowards*, 573 So 2d 499, 501 (La App 1990) (increase in liability coverage limits constituted new contract, requiring new UM coverage).

Thus, it appears that a number of appellate courts have interpreted their similar UM statutes contrary to the majority's interpretation of our statute in this case. The majority opinion here does not even mention, much less try to distinguish, the authorities favorable to plaintiff's position that are cited in plaintiff's response to Allstate's petition for review.[8]

From the foregoing, and because of the statutory directive that remedial legislation should be liberally construed to provide the intended protection,[9] I conclude that the changes shown by the facts presented in this case resulted in the creation of a new contract that triggered a duty for Allstate to make a new offer of UM coverage. Specifically, I would hold that a new offer should have been made on May 5, 1986, when collision and comprehensive coverage were added for the Datsun, which previously only had liability coverage. A new offer should have been made on September 15, 1986, when the Chevrolet was *added*, as it was not a replacement vehicle, but replaced a one-car coverage contract with a two-car coverage contract. The first of those events added a type of coverage that previously had not been purchased, resulting in an increased premium and a different scope of coverage. The second of those added an entirely new vehicle with a type of coverage (liability only) different from the coverage on the

---

[8] *See* Annot, *Construction of Statutory Provision Governing Rejection or Waiver of Uninsured Motorist Coverage*, 55 ALR3d 216 (1974) (Supp 1992). Although there are a variety of uninsured motorist statutes in the United States, there are clear legislative trends, and many of the statutory provisions in different states are essentially identical. 1 Widiss, Uninsured and Underinsured Motorist Insurance, 22, (2d ed 1992) § 2.1.

[9] Although the number of uninsured/underinsured and unidentified hit-and-run motorists is declining due to the statutory requirements for automobile insurance, the hazard presented by such irresponsible motorists is significant because of their numbers and because, as a group, they are more accident prone.

other insured vehicle, again resulting in an increased premium and a different scope of coverage.

In conclusion, I would adopt a "material change" test, *i.e.*, an insurer must make a new UM offer whenever there is any "material change" in an existing automobile insurance contract.

My result presents no burden for any insurer. A new offer of UM coverage easily may be programmed into any insurer's computer to appear on the Declarations page and billing statement whenever, as here, the terms of an insurance contract are materially changed. Moreover, if the insured accepts the offer for increased UM coverage, the contract premium easily may be adjusted accordingly. Because its premium is fixed to reflect its risk (including a profit), the insurer loses nothing. Why this court would want to construe narrowly a remedial statute, intended to protect motorists from the hazard created by financially irresponsible motorists or unidentified hit-and-run drivers against the class of persons whom it was intended to protect, bewilders me.[10]

In any event, this case presents the legislature with an opportunity to clarify ORS 742.502(2) and thereby eliminate the necessity for judicial interpretation of legislative intent regarding the question of *when* the duty created by that statute arises and when a new or later offer must be made.

For the reasons expressed in this opinion, I agree with the Court of Appeals that the trial court erred in granting summary judgment for Allstate. If these facts do not show a *new* contract that triggered Allstate's duty under ORS 742.502(2) to make plaintiff a new offer of UM coverage, it would be difficult to imagine what facts would.

---

[10] In 1957, New Hampshire became the first state to require insurance companies to include uninsured motorist coverage in all liability policies issued or delivered by any insurer licensed in that state, on any motor vehicle principally used or garaged in that state. Forty-nine states now have legislation in effect that establishes various types of requirements for this coverage, and it has become an integral part of automobile policies throughout the United States. Without question, uninsured motorist insurance continues to be a significant source of indemnification for persons injured in automobile accidents.

The practical effect of the majority holding is that, regardless of the number of new policies issued after the original contract has been made, the insurer will never be required to make a new offer of UM coverage so long as the relationship between insurer-insured continues.

Fadeley and Unis, JJ., join in this dissent.

**FADELEY, J.,** dissenting.

Plaintiff was injured by an uninsured motorist. Plaintiff seeks a declaration that defendant, her own insurer, must provide her with $100,000 of uninsured motorist coverage even though her policy stated that it provided only $25,000 of such coverage as of the time of her injury. Plaintiff claims the right to an increased amount of coverage arguing that defendant failed to comply with a statute that requires insurers to offer increased amounts of uninsured motorist coverage to their insureds whenever the insurer issues a motor vehicle liability policy. Defendant made the offer once, in 1985, with its first issuance to plaintiff, but it never again offered the higher amount of coverage at issuance of numerous changes and renewals thereafter.

The statute on which plaintiff bases her claim in this declaratory proceeding, ORS 742.502, provides in part that:

> "*Offers* of uninsured motorist coverage larger than the amounts required by ORS 806.070 *shall* include underinsurance coverage * * * equal to the uninsured motorist coverage benefits less the amount recovered from other automobile liability insurance policies." (Emphasis added.)

The statute does not prescribe any remedy for failure to make the offers, stated in the plural, required by it.

That lack of remedy is a matter for consideration by the legislature, not this court, in my opinion. The statute requires an offer, not inclusion of an additional contract. At oral argument, the insurer indicated that, if a new offer was statutorily required in this case, the court should declare that plaintiff's policy limits are $100,000 for uninsured motorist coverage. No contention questioning correctness of that remedy was raised.[1]

---

[1] Normally, the assumptions of parties may not dictate the court's remedies. Otherwise, our rule against deciding a hypothetical case could be circumvented by

I cannot agree that the legislature's purpose — to increase the amount of insurance coverage available to pay the costs of injuries to Oregonians — is met by the majority's limiting interpretation of the mandatory statute. Specifically, I do not agree that the legislature meant to limit the written offer of uninsured and underinsured insurance only to the first time that a company deals with one of its individual customers, no matter how many later times there is a change in the insurance contract that is in force between the company and that individual insured. Yet, that limiting interpretation, which substantially negates the purpose of the statute, is the effect of delegating sole authority to the insurer to decide what constitutes issuing a new "policy" and, therefore, at what point, if ever, a new offer of underinsured coverage must be made. But that delegation to the insurer is the basis of the majority's opinion. I cannot join in that limiting interpretation of the statute, an interpretation that negates the purpose of the statute. The dissenting opinion has the better of the argument concerning the correct interpretation of the statute.

In my opinion, a new issuance occurred — triggering the statutory duty to offer a larger amount of uninsured motorist coverage — each time that there was a major change in policy provisions or in coverage applicable between plaintiff and defendant. Not counting renewals for a new period as a new issuance, there were nonetheless several major changes during the years after plaintiff became defendant's insured but prior to her injuries that prompted this declaratory proceeding. Accordingly, I cannot join the majority opinion's reasoning.

---

agreements between the parties. *See State v. Thomas*, 311 Or 182, 186 n 6, 806 P2d 689 (1991) (parties cannot limit appellate court to only the arguments that the parties raise). In this case, granting the declaration which the insurer agreed would be proper would not form a precedent for other cases, in my opinion.