950 P.2d 297 (1997)
124 N.M. 323
1997-NMCA-124
Joe VIGIL and Genara Vigil, Individually and as guardians and parents of Eloy Vigil and Jennifer Vigil, Minors, Plaintiffs-Appellants,
v.
RIO GRANDE INSURANCE OF SANTA FE, Dairyland Insurance Company, and John Does I-V, Defendants-Appellees.
No. 17544.
Court of Appeals of New Mexico.
November 14, 1997.
*298 James A. Burke, Santa Fe, Jeffrey Romero, Albuquerque, for Plaintiffs-Appellants.
Virginia Anderman, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for Defendants-Appellees.

OPINION
FLORES, Judge.
1. Plaintiffs, Joe and Genara Vigil, filed a complaint against Defendants for damages and declaratory relief arising out of an accident involving Genara Vigil and an uninsured motorist. Defendants denied coverage to Plaintiffs based on the fact that Genara Vigil had signed a form rejecting uninsured motorists coverage. The trial court granted summary judgment in favor of Defendants. We affirm the trial court and hold that, under the particular facts of this case, the rejection form signed by Genara Vigil was valid and Plaintiffs are not entitled to have uninsured motorists coverage read into their policy.

FACTS
2. Plaintiffs, husband and wife, insured their vehicles with Defendant Dairyland Insurance Company. They purchased the insurance through Defendant Rio Grande Insurance. Prior to January 27, 1992, Joe Vigil had requested a quote from Rio Grande Insurance for liability insurance only. Joe Vigil told Rio Grande Insurance that he wanted liability insurance to cover him against a lawsuit. Joe Vigil was given a quote and told that he would be required to make three months' worth of payments in order to secure the insurance. On January 27, Joe Vigil "sent" Genara Vigil to the Rio Grande Insurance office to purchase the insurance. Genara brought enough cash to pay the liability-insurance premium in accordance with the quote. Rio Grande Insurance required a minimum payment of three months, whereas, Dairyland Insurance Company required only a minimum payment of two months. Genara signed an application form to insure a 1973 Ford Maverick, listing herself and her husband as drivers under the policy. Genara rejected uninsured motorists (UM) coverage and signed a form stating that such coverage had been explained to her, that she fully understood that her policy would not contain this coverage when issued or renewed, and that she would be able to add the coverage to the policy at any future date. Genara also signed a Coverage Explanation form which indicated that she was receiving liability insurance only and that no UM coverage would be included.
3. The Vigils were mailed a copy of the policy, along with a declarations page which indicated that they were covered by liability insurance for property damage and bodily injury. The declarations page contained language stating, "UNINSURED MOTORIST COVS REJECTED" on the front of the page *299 and "UNINSURED MOTORISTS COVERAGES HAVE BEEN REJECTED" on the back of the page. Over the course of the next three years, Joe Vigil visited the Rio Grande Insurance office approximately five times to change coverages under the policy. According to documents included in the record proper, these changes included the addition of a 1980 Pontiac Firebird and a 1978 Chevrolet pickup. There was also a document indicating a "change" to cover the 1981 Mercury involved in the accident for which the Vigils claim coverage should have been provided. Each time that the premium was due or there were changes made in the policy, Defendants mailed a declarations page to the Vigils, which stated, "UNINSURED MOTORIST COVS REJECTED," and "UNINSURED MOTORISTS COVERAGES HAVE BEEN REJECTED."
4. On February 27, 1995, Genara Vigil, while driving the 1981 Mercury, was involved in an automobile accident with an uninsured motorist. At the time of the accident, Joe Vigil did not believe that he had UM coverage. Joe Vigil realized the importance of the coverage when he found out that "we weren't covered and that we had medical bills stacking up and that it was important to have uninsured motorists." Defendants informed the Vigils that they were not covered because they had not purchased UM coverage. The Vigils ultimately filed an amended complaint alleging that Defendants were liable for negligence, misrepresentation, fraud, violation of the insurance code, and violation of the New Mexico Unfair Claims Practice statute, NMSA 1978, Section 59A-16-20 (1993). The Vigils also claimed that they were entitled to reformation of the insurance contract to include UM coverage.

DISCUSSION

Preservation of Issues
5. On appeal, Defendants vigorously argue that the issues included in Plaintiffs' brief in chief were not properly preserved in their pleadings. Because we affirm on the merits, we do not address this argument.

Initial Rejection of Uninsured Motorists Coverage
6. Plaintiffs challenge the validity of the initial rejection of UM coverage on three grounds: (1) Joe Vigil, the named insured, did not sign the rejection form; (2) the rejection was not made knowingly and intelligently; and (3) the application and declarations page of the insurance policy were never approved by the superintendent of insurance. We disagree with all three arguments.
7. NMSA 1978, Section 66-5-301(A) (1983) provides that:
No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person ... shall be delivered or issued for delivery in New Mexico ... unless coverage is provided therein or supplemental thereto ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury... resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.
In essence, this subsection of the statute requires that UM coverage be included in all liability insurance policies issued in connection with automobiles. However, the statute also allows an insured to choose not to purchase UM coverage by specifically rejecting such coverage. Section 66-5-301(C) states in material part:
The named insured shall have the right to reject uninsured motorist coverage as described in Subsections A and B of this section; provided that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverage in connection with a policy previously issued to him [or her] by the same insurer.
In other words, an insured has the option of either rejecting UM coverage or protecting himself or herself against a financially irresponsible motorist. See Lee v. General Accident Ins. Co., 106 N.M. 22, 23, 738 P.2d 516, 517 (1987). The rejection allowed under Subsection C must be made part of the insurance *300 policy by endorsement on the declarations sheet, attachment to the policy, or by some other means that makes the rejection a part of the policy. See Romero v. Dairyland Ins. Co., 111 N.M. 154, 156, 803 P.2d 243, 245 (1990). This requirement provides affirmative evidence to the insured regarding the extent of coverage. Id. By making a rejection a part of the policy, an insured is clearly notified of the fact that UM coverage has been waived. Id. "The policy behind [UM] coverage is to compensate those persons injured through no fault of their own." State Farm Auto. Ins. Co. v. Kiehne, 97 N.M. 470, 471, 641 P.2d 501, 502 (1982). This policy, however, is not violated by the failure of an insured to maintain UM coverage. Id.
8. Plaintiffs argue the rejection was invalid because it was signed by Genara Vigil rather than Joe Vigil, the named insured. In this case, Joe Vigil "sent" Genara Vigil to the Rio Grande Insurance office to purchase insurance in accordance with a discussion concerning liability insurance that took place on January 27, 1992. The discussion concerned the purchase of liability insurance onlyto ensure that Joe Vigil would be covered in case of a lawsuit. Because Joe Vigil was unable to go to the Rio Grande Insurance office and purchase the insurance himself, he specifically authorized Genara Vigil to do so in his place. Genara Vigil acted as Joe Vigil's agent. See Warren v. New York Life Ins. Co., 40 N.M. 253, 268-69, 58 P.2d 1175, 1184-85 (1936) (Zinn, J., specially concurring) (wife may bind husband by her contracts made on his behalf with authority derived from him; assent from husband can be precedent or subsequent, express or implied); Hansler v. Bass, 106 N.M. 382, 387, 743 P.2d 1031, 1036 (Ct.App.1987) (agent is one authorized by another to act on his or her behalf and under his or her control); see also Loya v. State Farm Mut. Ins. Co., 119 N.M. 1, 3, 888 P.2d 447, 449 (1994) (when married couple contracts for insurance coverage for family, presumption is that coverage applies with equal effect to both parties; each is considered a purchaser of the contract). Where an agent has actual authority to act on behalf of the principal, the principal is bound by the acts of its agent. See Tabet v. Campbell, 101 N.M. 334, 337, 681 P.2d 1111, 1114 (1984). In this case, Genara Vigil had actual authority from Joe Vigil to purchase liability insurance only and sign the contract with Defendants. Therefore, Joe Vigil is bound by Genara Vigil's actions in procuring the insurance and rejecting the UM coverage. We assume that it would be an unusual circumstance in which one spouse would not bind the other in dealing with an insurance agent regarding a family vehicle. See Loya.
9. Plaintiffs also maintain that the rejection of UM coverage was not knowing and intelligent because the insurance agent did not explain the significance of UM coverage at the time of the rejection. It is clear that the forms Genara Vigil signed showed that UM coverage was not included in the policy being purchased. For example, Genara Vigil signed the portion of the application form titled, "UNINSURED MOTORIST REJECTION" which stated, "I have had Uninsured Motorists Coverage explained to me and fully understand it. I hereby reject such coverage and understand that my policy will not contain this coverage when issued or renewed. I also understand that I may add this coverage to my policy at any future date." Genara Vigil also signed another form titled, "COVERAGE EXPLANATION" which stated, "I understand that I have purchased only the coverages indicated below with an `X'." The form further stated, "I also understand that I am NOT INSURED for any coverages marked `NONE'." On the Coverage Explanation form, Uninsured Motorists Bodily Injury is marked "NONE." At the bottom of the form, it states, "I have read each item above and understand how each one affects me." Based on the application forms completed by Genara Vigil, an insurance policy was issued to Plaintiffs which provided liability coverage, but no UM coverage. Plaintiffs do not argue that the forms signed by Genara were unclear; instead, they focus only on the question of whether the insurance agent should have explained the value of UM coverage to the Vigils, and in effect should have attempted to convince them to buy that coverage as well as the liability coverage.
10. Nothing in the applicable statute requires an insurer to make a purchaser *301 aware of the importance of UM coverage before accepting a rejection of such coverage. In addition, the case law discussing UM insurance requires only that the insured be appropriately informed that he or she has rejected the coverage. Romero, 111 N.M. at 156, 803 P.2d at 245. In other words, in New Mexico, a purchaser must only be fully informed of the fact of rejection, rather than the significance of the rejection; an insurance agent has no duty to inform prospective purchasers of the ramifications of their decision. See Parker v. E.I. Du Pont de Nemours & Co., 121 N.M. 120, 125, 909 P.2d 1, 6 (Ct.App.1995) (existence of duty is question of law). Furthermore, as noted above, the language of the rejection and documents accompanying the policy clearly informed Plaintiffs that no UM coverage had been purchased or would be provided. Plaintiffs' subsequent claim that they did not understand the importance of UM coverage does not raise a fact question as to whether the rejection was knowing and intelligent. See Cronbaugh v. Farmland Mut. Ins. Co., 475 N.W.2d 652, 654 (Iowa.Ct.App.1991) (where insured had opportunity to read contract, insured could not later claim that he or she did not understand the ramifications of the previous rejection).
11. Moreover, in addition to the notice provided by the declarations page, Joe Vigil was well aware that he had not obtained UM coverage in connection with his insurance policy. In his deposition, Joe Vigil was asked, "When you found out that the other driver was uninsured, you didn't believe that you had uninsured motorists coverage?" Joe Vigil responded, "Yeah, I didn't believe we had it, but I didn't realize how important it was to have it." With respect to the validity of the initial rejection of UM coverage, the evidence clearly shows that Joe Vigil did not intend to purchase the coverage and that, both before and after the accident, he was aware that he had not purchased the coverage.[1] Plaintiffs also argue that the language included in the declarations page stating, "UNINSURED MOTORIST COVS REJECTED" and "UNINSURED MOTORISTS COVERAGES HAVE BEEN REJECTED," was unclear. But the clear meaning of the language pertaining to UM coverage is that Plaintiffs did not have such coverage.
12. Plaintiffs argue that reversal is required in this case because the application form with its rejection language and the declarations page were never submitted for approval to the superintendent of insurance. Plaintiffs claim that the mere fact that these forms were not submitted to the superintendent for approval renders the policy a "nullity." In this regard, NMSA 1978, Section 59A-18-12(A) (1993), provides that "[n]o insurance policy or annuity contract shall be delivered ... in this state, nor shall any assumption certificate, endorsement, rider or application which becomes a part of any such policy be used, until a copy of the form and the classification of risks pertaining thereto have been filed with the superintendent."
13. We reject Plaintiffs' argument that the policy automatically becomes a nullity if part of the policy, such as the declarations page, has not been approved by the superintendent. Such a holding would mean that Plaintiffs' own policy is null and void, and provides no coverage of any kind, let alone UM coverage. What Plaintiffs appear to be arguing in this regard is that the portion of the policy that was not approved, the declarations page, is a nullity only to the extent Plaintiffs wish it to bethat is, that the portion indicating that UM coverage was rejected should be stricken, leaving them with such coverage. We will not interpret the statute in the manner argued by Plaintiffs. Compare Mutual Life Ins. Co. v. Daddy$ Money, Inc., 646 S.W.2d 255 (Tex.Ct. App.1982) (court will not enforce unapproved rider that directly contradicts term in approved policy) with FDIC v. American Cas. *302 Co., 975 F.2d 677, 682-83 (10th Cir.1992) (voiding of unapproved exclusion is unduly severe remedy). In any event, even if the application form and declaration page are covered by Section 59A-18-12(A) and even if a private cause of action could be predicated on a violation of that sectionissues we need not decidePlaintiffs must at least show prejudice resulting from Defendant's failure to submit the application if they are to prevail on a private cause of action. Cf. Romero, 111 N.M. at 158 n. 1, 803 P.2d at 247 n. 1 (plaintiff has private right of action under article 16 of insurance code if it is proven that plaintiff suffered damages from a specific violation of the article). In other words, Plaintiffs must show that if the declarations page had been submitted to the superintendent for approval, the superintendent would have disapproved the form and required a different manner of indicating that UM coverage was not provided under the policy. Also, Plaintiffs must show that if they had read the different language, they would have purchased UM coverage. Plaintiffs have failed to present evidence tending to establish either of these propositions. In addition, as we pointed out above, Joe Vigil knew he did not have UM coverage, did not make any effort to add such coverage, and intended to purchase only liability coverage.

New Rejections When Vehicles Added to Policy
14. Plaintiffs argue that each time they added vehicles to the policy or made changes affecting the premiums to be paid on the policy, the policy became a "new" policy rather than a renewal policy. Therefore, Plaintiffs contend, a new rejection was required under our statute. We disagree. The pertinent statutory language is: "[Uninsured motorist] coverage need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverage in connection with a policy previously issued to him [or her] by the same insurer." Section 66-5-301(C). In our view, here we are dealing with a continuation of the original policy.
15. A policy consists of a contract of insurance between an insurer and an insured, including "all clauses, riders, endorsements and papers which are a part thereof." See NMSA 1978, § 59A-18-2 (1984). Insurance policies are personal, inuring to the person, not the vehicle to be covered under the policy. See State Farm Mut. Auto. Ins. Co. v. Jackson, 757 F.2d 1220, 1226 (11th Cir.1985); Makela v. State Farm Mut. Auto. Ins. Co., 147 Ill.App.3d 38, 100 Ill.Dec. 505, 512, 497 N.E.2d 483, 490 (1986) (insurance policy is personal); Chavez v. State Farm Mut. Auto. Ins. Co., 87 N.M. 327, 330, 533 P.2d 100, 103 (1975) (uninsured motorists coverage protects the insured and is not intended to be limited to a particular occasion or a particular vehicle). The policy purchased by Plaintiffs contained an automatic coverage provision for additional, replacement, or substitute vehicles. The policy states: "We insure any car described on the declarations page and any car you replace it with. We'll also insure any additional car you acquire ... [b]ut the replacement or addition is insured only if you notify us within 30 days of its acquisition." The idea that an insurance policy is personal means that the policy trails the insured regardless of what vehicle is to be covered by the policy. See Jackson; Chavez. When, as in this case, an insured purchases a policy with a provision that automatically covers any additional vehicle, there is no change in the insurance contract or the coverage purchased pursuant to that contract when a vehicle is added to the policy. See Makela, 100 Ill.Dec. at 512-13, 497 N.E.2d at 490-91. Each time a change was made by Plaintiffs, Joe Vigil contacted Defendants and provided information concerning the change as required by the policy. No new application was completed by Plaintiffs at any time.
16. We are of the opinion that, under circumstances such as those involved in this case, the addition of vehicles or changes made which may affect the premiums owed under an insurance policy do not constitute changes such that a new policy is created. Based on the automatic coverage provision in the policy and our statutory definition of "policy," we hold that when Plaintiffs added or replaced vehicles under the policy, no new contract was created, but the change merely amounted to a continuation of the original *303 policy. Other jurisdictions have ruled in a similar fashion. See, e.g., Sentry Ins. A Mut. Co. v. McGowan, 425 So.2d 98, 99 (Fla.Dist. Ct.App.1982) (addition of vehicle does not constitute a variation in terms of the policy material enough to require new rejection of uninsured motorists coverage); Makela, 100 Ill.Dec. at 512-13, 497 N.E.2d at 490-91 (only one offer of uninsured motorists coverage required in circumstances similar to case at bar); Pierce v. Allstate Ins. Co., 316 Or. 31, 848 P.2d 1197, 1199-1201 (1993) (en banc) (no need to offer uninsured motorists coverage option when vehicle added to policy where policy includes all endorsements and coverage provisions in policy apply coverage to additional and replacement vehicles); El-Habr v. Mountain States Mut. Cas. Co., 626 S.W.2d 171, 172 (Tex.Ct.App.1981) (endorsement to add vehicle made part of original insurance contract; endorsement merged with original policy).
17. It is true that in some jurisdictions, the addition of a vehicle to a policy is considered an event requiring a new rejection of UM coverage. See, e.g., Perkins v. Guaranty Nat'l Ins. Co., 667 So.2d 559, 563 (La.Ct. App.1995) (addition of vehicle increases policy coverage so cannot be considered renewal); Beauchamp ex rel. Beauchamp v. Southwestern Nat'l Ins. Co., 746 P.2d 673, 676 (Okla.1987) (coverage of additional vehicle created an object of insurance and a new premium of insurance distinct from original policy); Lucky v. Equity Mut. Ins. Co., 259 Ark. 846, 537 S.W.2d 160, 162 (1976) (allowing one rejection to cover additional vehicles violates public policy that expects uninsured motorists coverage to be issued and rejected any time liability insurance is delivered in state). These cases are mainly premised on the rationale that UM coverage should be the rule, with exceptions thereto construed narrowly. Our Supreme Court, however, has indicated that the crucial requirement concerning UM rejections is that the insured be made well aware of the insured's initial decision to reject UM coverage. See Romero, 111 N.M. at 156-57, 803 P.2d at 245-46. In this case, that requirement was met. In addition, as we have already pointed out, our statute defining "policy" and our previous cases on the personal nature of such policies support our following the majority view adopted by, for example, the Florida, Illinois, Oregon, and Texas cases in this instance. We believe that maintaining consistency with previous cases and faithfulness to the statutory language requires this result.

Defendants' Change Form
18. Plaintiffs contend that the policy change form used by Defendants, by its language, requires that UM coverage be provided when a vehicle is added to the policy unless a new rejection is signed by the insured. Each time that Joe Vigil made changes to his insurance policy, he signed the front of a form titled "AUTO/CYCLE POLICY CHANGE REQUEST." The form includes areas for providing driver information, vehicle information, and coverages/lienholder information. A note at the top of the form states, "[w]hen changing name of insured, adding vehicles, changing limits or adding coverages, applicable selections must be made on the reverse of this form." The reverse side of the form provides,
[i]f the changes requested on the reverse side of this form involve adding a vehicle, change of name, change of limits or addition of coverages, the following applicable selections must be indicated. If a selection has not been made, or is unsigned, we will provide UM/UIM limits as required by individual state law.
Defendants' agent explained that the form is a generic form used for all states and that, if a state does not require signatures for changes made on the policy, then no signature is requested. The agent testified that the only time that a signature would be required on the form would be if a policy included certain coverages and the insured desired to reject the existing coverage.
19. Joe Vigil signed a policy change request for the vehicle involved in the accidenta 1981 Mercury. The code "C = change," rather that "A = Add," is used on the change form, indicating that the change regarding the 1981 Mercury was not considered an addition of a vehicle thereby triggering any necessity to fill out the back of the form. According to the form itself, the back *304 was to be used only when changing the name of the insured, adding vehicles, changing limits, or adding coverages. The change here was a change, not an add, and did not involve a change of name or of limits. Therefore, with respect to the 1981 Mercury, there was no need to make selections on the reverse side of the form since the front of the form excluded the applicability of the reverse side of the form.

Negligent Misrepresentation/Constructive Fraud/Unfair Claims Practice
20. Plaintiffs included in their complaint several arguments pertaining to their claim that Defendants did not provide adequate information with respect to coverages available. Along these lines, Plaintiffs claim that Defendants are liable for negligent misrepresentation in that they did not explain the importance of UM coverage to either Plaintiff, and they also sent "misleading" declarations pages to Joe Vigil, that caused him to think he had been rejected for UM coverage. A defendant may be held liable for negligent misrepresentation if the defendant breached a duty of disclosure owed to plaintiff, plaintiff had a right to rely on the misinformation, and plaintiff sustained damages as a result. Ruiz v. Garcia, 115 N.M. 269, 274-75, 850 P.2d 972, 977-78 (1993); see also Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 209, 880 P.2d 300, 306 (1994) (negligent misrepresentation involves making an untrue or misleading statement).
21. We have already explained that Defendants had no duty to inform Plaintiffs of the significance of UM coverage. Absent such a duty, their failure to do so in this case cannot give rise to liability for negligent misrepresentation. Ruiz, 115 N.M. at 274-75, 850 P.2d at 977-78. In addition, as we also discussed above, Plaintiffs presented no evidence indicating that if the language of the declarations page had been different, they would have purchased UM coverage. For that reason, Plaintiffs have not raised a question of fact as to whether they relied on the supposed negligent misrepresentation made by Defendants. Id. Moreover, Genara Vigil testified that she did not believe that Defendants' agent lied to her or gave her misinformation.
22. Plaintiffs also refer to claims for constructive fraud and unfair claims practice based on the repeated argument that Defendants' agent did not fully explain the significance of UM coverage and based on the fact that Rio Grande Insurance required three monthly payments to initiate the policy even though Dairyland Insurance only required two such payments. For these reasons, Plaintiffs claim they were treated unfairly by Defendants. We reiterate that Defendants owed no duty to Plaintiffs to explain the significance of UM coverage. In addition, Plaintiffs have no grounds for their claims. Constructive fraud is the breach of a legal or equitable duty which the law terms fraudulent because of the tendency to deceive others. See Parker, 121 N.M. at 132, 909 P.2d at 13. There is no evidence that the policy of collecting three payments instead of two was applied only to Plaintiffs, and not to other purchasers doing business with Rio Grande Insurance. No evidence was presented by Plaintiffs to show that, by requiring an additional month's worth of payment up front, Rio Grande was attempting to deceive Plaintiffs into rejecting the UM coverage. These claims are meritless.

Ratification
23. Plaintiffs make a very unclear argument that a claim for ratification exists in this case. As far as we can tell, Plaintiffs are claiming that Dairyland Insurance ratified the actions of Rio Grande Insurance, and, therefore it is liable for damages to Plaintiff. Since we hold that Rio Grande Insurance is not liable to Plaintiffs, we also hold that Dairyland Insurance is not liable, even if it ratified the actions of Rio Grande Insurance.

CONCLUSION
24. We are aware that, in our state, many drivers choose not to purchase UM coverage. If, in cases such as this, we were to require an insurer to furnish UM coverage when the insured had no intention of securing such protection, we would be violating the doctrine of freedom of contract. Although we acknowledge that UM coverage is important *305 given the number of uninsured drivers in New Mexico, we decline to require an insurer to provide UM coverage in the face of clear evidence that the insured did not choose such coverage and knew it was not included in the policy.
25. As we have discussed above, Plaintiffs have failed to show that any triable issues of fact exist in this case. Therefore, for the reasons stated in this opinion, we affirm the trial court's order granting summary judgment in favor of Defendants.
26. IT IS SO ORDERED.
HARTZ, C.J., and PICKARD, J., concur.
NOTES
[1] Plaintiffs point to an affidavit signed by Joe Vigil, which was attached to the motion for reconsideration presented to the trial court and stated that, even if Joe Vigil expressed a desire to have liability coverage only, he did not intend to waive his right to UM coverage. We do not consider that affidavit. See Schmidt v. St. Joseph's Hosp., 105 N.M. 681, 684, 736 P.2d 135, 138 (Ct.App.1987) (affidavit that was not before trial court at summary judgment hearing cannot be reviewed by appellate court).