600 S.E.2d 565

**Andrea E. BURROWS, Plaintiff**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, et al., Defendants,**

**and**

**Deidra M. BEELER, Plaintiff**

v.

**Nationwide Mutual Insurance Company, et al., Defendants.**

**Nos. 31344, 31345.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 2004.

Decided Feb. 19, 2004.

**670**

James I. Stealey, Goldenberg, Goldenberg & Stealey, Parkersburg, West Virginia, Attorney for the Plaintiff.

James S. Crockett, Jr., Mary M. August, Spilman Thomas & Battle, PLLC, Charleston, West Virginia, Attorney for Amicus Curiae, West Virginia Insurance Federation.

Anita R. Casey, Donna S. Quesenberry, MacCorkle, Lavender, Casey & Quesenberry, Charleston, West Virginia, Attorneys for the Defendants.

ALBRIGHT, Justice:

These two cases arise by certified question from the United States District Court for the Southern District of West Virginia and both cases present related issues concerning the application of certain statutory requirements which address the circumstances under which insurance companies are required to make underinsured motorist coverage available to insureds. While underinsured motorist coverage was waived in each case at one point in time, the questions presented by the federal court involve a determination of whether the death of the named insured who executes a waiver of such optional coverage or the removal of such person from the policy terminates the otherwise binding effect of that waiver. Additionally, we are asked to determine whether policy changes made by the insured, which concern the types of coverage but do not involve any alteration of the actual liability limits, can trigger the statutory requirements that require the offering of underinsured motorist coverage.

## I. Factual and Procedural Background

### A. Burrows Case

On June 14, 1982, Nationwide Mutual Insurance Company ("Nationwide") issued an automobile liability policy to Esther Chapman, the mother of Andrea E. Burrows. Mrs. Chapman executed a waiver on June 5, 1992, wherein she specifically rejected Nationwide's offer of underinsured motorist coverage in connection with her automobile liability policy.[1] Ms. Burrows was added to her mother's insurance policy as a named insured on or about June 14, 1993. On or about December 15, 1995, Mrs. Chapman executed a second waiver wherein she expressly rejected any underinsured motorist coverage.[2]

Due to Mrs. Chapman's serious illness,[3] she was removed as an insured driver from the Nationwide policy on April 26, 1997. In May 1999, Nationwide sent out a form letter to all of its insureds that offered increased optional levels of uninsured and underin-

---

1. On that same form, Mrs. Chapman selected to purchase $100,000 per person and $300,000 per occurrence of uninsured motorist coverage.

2. At this time, she reduced her uninsured coverage to the required minimal limits (i.e. $20,000

of bodily injury coverage and $40,000 per occurrence). *See* W.Va.Code § 33-6-31(b) (1998) (Repl.Vol.2003).

3. She died in January 1998.

sured motorist coverage. Ms. Burrows did not reply to or return the form offering her an increased level of uninsured or underinsured motorist coverage. On July 9, 2001, Ms. Burrows was involved in an automobile accident and the insurance limits of the other driver's policy did not cover the costs of all her injuries.

During the period when she was the sole named insured, Ms. Burrows did not alter the previously established limits of liability coverage or the amount of uninsurance. There were only two changes made prior to the accident. On August 21, 1997, she increased her comprehensive deductible from zero to $100 and removed $2,000 in medical payments coverage. In addition, on April 3, 2000, Ms. Burrows added loss of use, towing and labor coverage to her Nationwide policy.

When Nationwide denied her claim for underinsured motorist benefits, Ms. Burrows initiated a civil action in state court against Nationwide, as well as the driver of the vehicle involved in her accident and his mother, the policy owner. Nationwide removed that proceeding to federal court and the Honorable Joseph R. Goodwin has framed two questions for this Court's resolution before the primary issue of whether the mass mailing Nationwide distributed to its insureds in 1999 constituted a commercially reasonable offer of underinsured motorist coverage can be resolved in the federal proceeding.[4] The questions certified to us by the federal district court are:

1. Is the rejection of optional underinsured motorist coverage by the plaintiff's mother, who, with the plaintiff, was a named insured on the policy at the time of waiver, binding upon the plaintiff after (a) the mother comes off the insurance policy, or (b) the mother's death?

2. Does the phrase "requests different insurance coverage limits" in West Virginia Code § 33–6–31d(e) encompass the ad-

dition of comprehensive coverage, loss of use, and/or towing and labor coverage to an existing automobile policy, such that an insurer is required to make a new offer of underinsured motorist coverage pursuant to that statute?

### B. Beeler Case

On July 16, 1987, Nationwide issued an automobile liability policy to Debra M. Anderson, the mother of Diedra M. Beeler. Ms. Beeler was first added as a named insured to her mother's insurance policy on June 5, 1998.[5] The initial terms of the policy issued to Mrs. Anderson provided for $100,000 per person and $300,000 per occurrence of bodily injury liability coverage; the same limits of uninsured motorist coverage; and $50,000 per person/$100,000 per occurrence of underinsured motorist coverage. These coverages remained in effect until July 23, 1990, when Mrs. Anderson either reduced or eliminated her insurance coverage. At such time, she chose to carry $20,000 per person/$40,000 per occurrence of bodily liability coverage and the same limits of uninsured motorist coverage. Another change effected pursuant to Mrs. Anderson's request was the removal of the optional underinsured motorist coverage from her policy.

In December 1990, Mrs. Anderson decided to increase her bodily injury liability to $50,000 per person/$100,000 per occurrence.[6] With this change, she maintained her uninsured motorist coverage at $20,000 per person/$40,000 per occurrence and again waived underinsured motorist coverage. By the time Ms. Beeler was involved in an accident on June 9, 2001, her mother had increased the bodily injury liability coverage to $100,000 per person/$300,000 per occurrence. While Mrs. Anderson continued to maintain the statutorily required amount of uninsu-

---

**4.** *See Bias v. Nationwide Mutual Ins. Co.,* 179 W.Va. 125, 365 S.E.2d 789 (1987) (holding that if insurer fails to comply with statutory duty to offer optional underinsured and uninsured motorist coverage in commercially reasonable manner, such coverage is included in policy by operation of law).

**5.** She was later removed as a covered insured on June 7, 1999, and then added as an insured driver on September 1, 2000.

**6.** This coverage change was for the policy period covering December 11, 1990, to January 16, 1991.

rance,[7] there was no underinsurance coverage in effect at the time of Ms. Beeler's accident.

In response to Nationwide's denial of her claim for underinsured motorist benefits, Ms. Beeler initiated a civil action in state court against Nationwide, as well as the driver of the vehicle involved in her accident, and one of the two policy owners. Nationwide removed that proceeding to federal court and the Honorable Joseph R. Goodwin determined that the following question must be addressed by this Court before it can consider the ultimate issue of whether the mass mailing Nationwide distributed to its insureds in 1999 constituted a commercially reasonable offer of underinsured motorist coverage:[8]

> 1. Does the phrase "requests different coverage limits" in West Virginia Code § 33–6–31d(e) encompass the addition of comprehensive and collision coverage to an existing automobile policy, such that an insurer is required to make a new offer of underinsured motorist coverage pursuant to that statute?

By separate orders entered on May 21, 2003, this Court accepted these two cases involving certified questions from the federal district court. We proceed to consider and answer these questions to aid the federal court with its resolution of the ultimate issue presented by both of these cases.

## II. Standard of Review

As we explained in *McDavid v. United States*, 213 W.Va. 592, 584 S.E.2d 226 (2003):

> This Court employs a plenary standard of review when we answer certified questions. In Syllabus Point 1 of *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998), we held that "[a] de novo standard is applied by this Court in addressing

the legal issues presented by a certified question from a federal district or appellate court." Also, the certified question before us requires us to construe the wrongful death act. We have held that "[w]here the issue ... is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

213 W.Va. at 594–95, 584 S.E.2d at 228–29. With this standard in mind, we proceed to examine the two certified questions presented by the federal district court.

## III. Discussion

### A. Burrows Case—Effect of Waiver

Under the provisions of West Virginia Code § 33–6–31d (1993) (Repl.Vol.2003), underinsured motorist coverage can be waived both directly and indirectly. By statute, insurers are required to offer this optional insurance coverage to any individual who applies for liability coverage. *See* W.Va.Code § 33–6–31d(a). On a form developed by the state insurance commissioner, an applicant for liability coverage is specifically apprised of the availability of underinsurance coverage[9] and the costs of same based on the coverage limits and whether coverage is sought in connection with a single or multicar policy.[10] This form, which is required to be delivered either in person at the time of the initial application for insurance or when the initial premium notice is sent to the applicant, contains a designated section where the insured can select the specific amount of underinsured coverage he or she desires. Alternatively, if the applicant does not wish to purchase such optional insurance

---

7. *See supra* note 2.

8. *See supra* note 4.

9. Although the statute in issue similarly requires that optional limits of uninsured motorist coverage be made available, we refer only to underinsured motorist coverage based on the limited focus of the certified questions presented to us.

10. This form, developed by the Insurance Commissioner, is required to: "1) Inform a named

insured of the optional coverages offered; 2) Inform the named insured of the rate calculation for the optional coverages including amount of coverage and the number of vehicles; and 3) Give the named insured the option to reject the optional coverage." *Ammons v. Transp. Ins. Co.*, 219 F.Supp.2d 885, 891 (S.D.Ohio 2002) (quoting from W.Va. Informational Letter No. 88, issued by W.Va. Ins. Comm'r July 1993).

coverage, there is a box to check and so indicate.[11]

Individuals who receive this form offering the optional insurance underinsurance coverage but choose not to return the same to their insurer within the thirty-day period prescribed by statute [12] are subject to the following presumption:

> Failure of the applicant or a named insured to return the form described in this section [W.Va.Code § 33–6–31d] to the insurer as required by this section within the time periods specified in this section creates a presumption that such person received an effective offer of the optional coverages described in this section and that such person exercised a knowing and intelligent rejection of such offer. Such rejection is binding on all persons insured under the policy.

W.Va.Code § 33–6–31d(d).

Just as the non-return of the form offering underinsured motorist coverage is binding on all insureds under a particular policy, the completion and transmittal of this form by an individual insured is treated, by legislative design, as "binding on all persons insured under the policy." W.Va.Code § 33–6–31d(b). While there is no dispute that Mrs. Chapman twice expressly rejected Nationwide's offer of optional underinsured motorist coverage, the query raised in connection with the issue of coverage available to her daughter is whether the removal of Mrs. Chapman as a named insured from the policy [13] extinguished the statutory reach of that waiver from applying to Ms. Burrows.

Presented in another fashion, this Court is being asked to identify the events which statutorily impose upon an insurer the duty to make an offer of optional insurance coverage to its insureds. To begin our analysis of this issue, we look to the statutory language of West Virginia Code § 33–6–31d to identify three events, the separate occurrence of which requires an insurer to make an offer of optional underinsured motorist coverage.[14]

Under the terms of West Virginia Code § 33–6–31d, the insurer must make an offer of optional underinsurance coverage concurrent with the initial purchase of liability coverage. In mandatory terms, the statute provides that "[o]ptional limits of . . . underinsured motor vehicle coverage required by section 31 [§ 33–6–31] of this article shall be made available to the named insured at the time of initial application for liability coverage." W.Va.Code § 33–6–31d(a). The manner in which the form offering the underinsurance coverage is required to be transmitted to the insurance applicant is further set forth by statute. The insurer has the option of either "delivering the form to the applicant" or "mailing the form to the applicant together with the applicant's initial premium notice." W.Va.Code § 33–6–31d(b).

In addition to the initial application for liability insurance, the statute provides two other triggers for offering underinsurance to an insured. The statute is clear that "upon any request of the named insured," underinsurance has to be made available. W.Va. Code § 33–6–31d(a). Finally, the statute provides that the forms offering the optional underinsured motorist coverage are to be made available "to any named insured who requests different coverage limits." W.Va.

**11.** The language immediately following the box indicates that individual has decided to "knowingly reject (DO NOT wish to purchase) UNDERinsured Motorists Coverage."

**12.** *See* W.Va.Code § 33–6–31d(b) (requiring insurance applicant to "complete, date and sign the form [offering underinsurance] and return the form to the insurer within thirty days after receipt thereof").

**13.** While the certified question speaks in terms of either the removal of the named insured or the death of that person, it is the removal of the insured that is significant for discussion purposes and not the death of the insured under the facts

of this case. Accordingly, we limit our discussion to consideration of the issue of a named insured's removal from the policy in terms of the effect, if any, such removal has on the issue of waiver of underinsured motorist coverage.

**14.** Under the statute, there was a fourth event, which no longer applies, that required insurers to send the insurance form to all existing insureds upon the enactment of West Virginia Code § 33–6–31d. *See* W.Va.Code § 33–6–31d(c) (requiring delivery of form offering optional insurance coverage to all named insureds having policies in effect on April 10, 1993).

Code § 33–6–31d(e). As to whether the statute imposes a duty to offer underinsurance upon insurers other than as expressly delineated, the Legislature clearly anticipated this issue and responded statutorily by providing: "No insurer is required to make such form available or notify any person of the availability of such optional coverages authorized by this section *except as required by this section.*" *Id.* (emphasis supplied)

Ms. Burrows argues that any waiver of underinsurance coverage effectuated by her mother was extinguished either when Mrs. Anderson was removed from the policy as a named insured, or alternatively, when she died.[15] To support her position, she looks to the objectives underlying the statutory requirements governing underinsurance, maintaining that she should have been treated as a new policyholder and separately advised of the availability of underinsurance coverage when she became the sole insured under the Nationbile policy. In her attempt to fall within the specified statutory criteria that control underinsured motorist coverage and, specifically, when it is required to be made available, Ms. Burrows also contends she was an "applicant" for a new policy of insurance at the time she called her agent to have her mother removed as an insured from the policy. Before addressing this issue, however, we first consider whether the objectives of underinsured motorist coverage are being thwarted by Nationwide's denial of such coverage in this case.

Citing this Court's recognition in *State Automobile Mutual Insurance Company v. Youler,* 183 W.Va. 556, 396 S.E.2d 737 (1990), of the public policy of "full indemnification or compensation [which] underl[ie] both uninsured and underinsured motorist coverage," Ms. Burrows argues that Nationwide contravened this policy by failing to separately offer her underinsurance coverage following her mother's removal from the policy. This objective of "full indemnification or compensation," as we explained in *Youler* was made in reference to obtaining compensation for "damages not compensated by a negligent

tortfeasor, up to the limits of the uninsured or underinsured motorist coverage." *Id.* at 564, 396 S.E.2d at 745. Expounding further on the statutory objectives at issue, we stated in *Riffle v. State Farm Mutual Automobile Insurance Co.,* 186 W.Va. 54, 410 S.E.2d 413 (1991), that

> [t]he purpose of *W.Va.Code* 33–6–31 [1988] is to provide all insurance buyers with an opportunity to purchase a minimum amount of underinsured motorist coverage. When the buyer is not given this opportunity, the statute provides him with the minimum coverage. The statute and our decision in *Bias[v. Nationwide Mutual Ins. Co.,* 179 W.Va. 125, 365 S.E.2d 789 (1987)][16] encourage insurance companies to make a real effort to inform customers about the opportunity for underinsured motorist coverage.

186 W.Va. at 56, 410 S.E.2d at 415 (footnote added).

In *Cox v. Amick,* 195 W.Va. 608, 466 S.E.2d 459 (1995), we reversed the trial court's ruling that each individual insured under one insurance policy had to be offered the opportunity to purchase or reject underinsured motorist coverage. Mr. Cox, the named insured on the Nationwide policy at issue, had expressly waived underinsurance coverage when he added his wife's vehicle to a policy he had owned prior to his marriage. In discussing whether each insured under an automobile insurance policy to be offered the optional insurance coverage mandated by West Virginia Code § 33–6–31b, we observed, "as a practical matter, it would be very time consuming and unreasonable to expect an insurer to offer every person who would be an insured under the policy the optional coverage and then ascertain whether the optional coverage was rejected." 195 W.Va. at 615, 466 S.E.2d at 466. After determining that West Virginia Code §§ 33–6–31(b) and –31d were required to be read in *pari materia* given their common subject matter, we applied the clear and unambiguous statutory language to hold that

---

**15.** *See supra* note 3. According to the amicus, Ms. Burrows has not alleged in the federal lawsuit that she advised Nationwide of her mother's death.

**16.** *See supra* note 4.

[u]nder *W.Va.Code*, 33–6–31d [1993] a knowing and intelligent rejection of optional uninsured and underinsured motorists coverages by any named insured under an insurance policy creates a presumption that all named insureds under the policy received an effective offer of the optional coverages and that such person exercised a knowing and intelligent rejection of such offer. The named insured's rejection is binding on all persons insured under the policy.

*Cox,* 195 W.Va. at 610, 466 S.E.2d at 461, syl. pt. 13.

This case presents a related, but previously unaddressed, issue of whether a waiver of underinsurance that is statutorily binding on all the insureds under one policy continues to be binding when the named insured is no longer an insured under the policy. The statute is silent as to this issue. However, the statute is unmistakably clear with regard to identifying which events trigger an insurer's duty to make an offer of underinsured motorist coverage and that those statutorily defined events are the *only* circumstances which trigger an insurer's statutory duty to offer such optional insurance. *See* W.Va. Code § 33–6–31d.

■■■ Even if this Court viewed the position advocated by Ms. Burrows as wise from a public policy standpoint,[17] our duty is not to retool the statute but merely to apply its provisions where the language at issue is unambiguous.[18] As we recognized in syllabus point five of *State v. General Daniel Morgan Post No. 548,* V.F.W., 144 W.Va. 137, 107 S.E.2d 353 (1959) "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Another rule of statutory construction that must be considered provides that "[i]n the interpretation of statu-

tory provisions the familiar maxim *expressio unius est exclusio alterus,* the express mention of one thing implies the exclusion of another, applies." Syl. Pt. 3, *Manchin v. Dunfee,* 174 W.Va. 532, 327 S.E.2d 710 (1984). Application of this principle requires the conclusion that had the Legislature deemed the removal of a named insured an event significant to trigger the requirement that optional underinsured motorist coverage be made available to existing insureds, the statute would have expressly directed insurers to distribute the above-discussed insurance form to the remaining insured(s) upon the occurrence of such event.

■■ There can be no dispute that it is the Legislature's sole prerogative to designate the circumstances upon which an insurer's statutory duty to offer optional insurance coverage such as underinsurance is triggered. The provisions of West Virginia Code § 33–6–31d are free from ambiguity as to what events trigger the requirement that insurers make available the optional insurance coverages required by West Virginia Code § 33–6–31(b). As discussed above, those three events specified by statute for offering such insurance do not include either the death of a named insured or the removal of a named insured from the policy. Accordingly, we conclude that the removal of a named insured as a policyholder on an automobile liability policy who directly or constructively executed a waiver of underinsured motorist coverage does not, standing alone, invalidate the statutory effect of the waiver that was implemented pursuant to the provisions of West Virginia Code § 33–6–31d. To conclude otherwise would be an act of judicial policy making. We prefer to leave for the Legislature the decision to amend this statute, should it so desire, rather than to improperly effect such an amendment through an opinion of this Court.

---

17. Counsel for Nationwide acknowledged that it would be preferable for insurers to make additional offers of underinsurance to the remaining named insureds when the insured who waived such optional coverage, directly or constructively, is no longer covered by the policy.

18. *See Nationwide Mut. Ins. Co. v. Buffetta,* 230 F.3d 634, 641 (3rd Cir.2000) (acknowledging that "a policy argument could be made to the effect that a new named insured should always have his or her voice count as to whether a reduced uninsured motorist coverage is requested, [but recognizing] this is not evident in the statutory language").

We are not persuaded by Ms. Burrows' contention that denial of underinsurance under the facts presented in her case contravenes the public policy sought to be achieved through the enactment of our insurance laws. As we explained in *Riffle*, it is the *offering* of such coverage—the *opportunity* to purchase such coverage—that is mandated by statute. 186 W.Va. at 56, 410 S.E.2d at 415. Insureds are free to reject this optional coverage and many insureds decidedly opt not to carry this additional coverage. While the Legislature's objective in mandating the offering of optional underinsurance coverage was certainly to provide a mechanism that would encourage or enable "full compensation" "up to the limits of the . . . underinsured motorist coverage," there is no law which requires that underinsurance must be purchased. In those situations when underinsurance was not purchased after it was properly offered, this Court cannot, solely based on the laudatory ideals of encouraging "full compensation," conclude that the insurer is obligated to provide such coverage.[19] *Youler*, 183 W.Va. at 564, 396 S.E.2d at 745.

Arguing that she was a new "applicant" for insurance when she notified her insurer of her mother's removal as an insured under the policy, Ms. Burrows argues that Nationwide was required to make an offer of underinsured motorist coverage under the terms of West Virginia Code § 33–6–31d. Although the terms of the Nationwide policy clearly allow any insured to request the issuance of a new policy at any time, we cannot equate the removal of a named insured from a policy with an actual request that a new policy be issued. Moreover, there are specific monetary and contractual reasons why it is preferable for insureds in many situations to continue their insurance coverage under an existing policy rather than to apply for a new policy. These factors include premium discounts and a policy of first-time accident forgiveness that are extended to long-term insureds, as well as a prohibition against cancellation and nonrenewal.[20] Consequently, in many circumstances it may not be prudent for a policy holder to request or come under the terms of a separate policy. On the record presented in this case, we find no basis for concluding that Ms. Burrows was seeking the issuance of a new policy from Nationwide when she contacted her agent to have her mother removed from the policy. Simply put, the policy change requested by Ms. Burrows was not the equivalent of requesting or applying for a separate and new policy of insurance.

### B. Beeler Case—"Different Insurance Coverage Limits"

At the center of this issue of statutory interpretation is the meaning of the third event delineated in West Virginia Code § 33–6–31d which requires an insurer to offer underinsured motorist coverage "to any named insured who requests different coverage limits." W.Va.Code § 33–6–31d(e). While this issue was certified with respect to both the Burrows case and the Beeler case, counsel for Ms. Burrows[21] conceded this issue in favor of Nationwide in the Burrows case.[22] Consequently, we will address this issue based on the facts presented in Beeler.

---

19. We also cannot overlook, as Nationwide points out, that Ms. Burrows was the policyholder who paid the premiums and received the policy renewals over a period of four years after her mother was removed from the policy. At any point in time, Ms. Burrows could have either contacted her insurance agent to inquire about the type of insurance coverage available to her, or made a request to change her policy to include underinsured motorist coverage.

20. *See* W.Va.Code §§ 33–6A–1 to –5 (2000) (Repl. Vol.2003).

21. The same counsel represents both of the plaintiffs involved in these two cases.

22. The basis for this concession appears to be counsel's adoption of the misguided position that invocation of this statutory provision requires a material change in the policy, which counsel defines to include a significant premium increase. In her brief, Ms. Burrows states the following:

> [I]t is the position of the plaintiff [Ms. Burrows] that unlike the companion case of *Beeler v. Nationwide*, Case No. 3134[5], also before this Court, the changes and additions of coverage under the plaintiff's policy were not material, and did not give rise to a requirement under West Virginia Code § 33–6–31d that Nationwide make a new offer of UIM coverage. Only where changes to the policy are material is the requirement of a new offer of UIM

Ms. Beeler contends that the changes effected in her mother's policy concurrent with her addition as a named insured to that policy in September 2000[23] constituted the requisite change in "coverage limits" sufficient to obligate Nationwide to make an offer of underinsured motorist coverage. Those changes were the addition of a named insured; the addition of comprehensive and collision coverage for Ms. Beeler's 1996 Plymouth Neon vehicle; and the addition of a new covered vehicle (the Neon). With the addition of Ms. Beeler's vehicle and the selected coverages, the premium for the policy held by Mrs. Anderson was increased by $342.80 every six months.

Viewing this amount as significant, Ms. Beeler maintains that this premium increase amounted to a material change which required Nationwide to issue a new policy and to make a separate offer of underinsured motorist coverage.[24] After acknowledging that the issue presented is one of statutory interpretation, Ms. Beeler quickly proceeds to suggest that "[t]he only reasonable interpretation of the phrase 'different coverage limits' which is consistent with the strong public policy [which] require[s] insurance companies to offer UIM [underinsured motorist] coverage is that when material changes in coverage occur, the insurer has an obligation to make UIM options forms available. . . ." Rather than engaging in any statutory analysis, Ms. Beeler presumes that whatever interpretation imposes upon insurers the obligation to make an additional offer of underinsured motorist coverage is the correct one, given the goal of encouraging "full compensation." *See Youler*, 183 W.Va. at 564, 396 S.E.2d at 745. As support for her position, Ms. Burrows relies on extrajurisdictional case law wherein the issue of whether underinsurance coverage had to be offered in a variety of circumstances was resolved based on whether "material" changes were affected to the policy at issue such that a "new" policy effectively resulted through the requested changes. *See, e.g., Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348 (5th Cir. 1998) (holding that addition of minor child as licensed driver with attendant 38% increase in premium materially changed risk insured and resulted in new policy); *Allstate Ins. Co. v. Kaneshiro*, 93 Hawai'i 210, 998 P.2d 490 (2000) (finding substitution of wife as sole named insured following divorce on policy where husband was previously sole named insured constituted material change resulting in new policy and required separate waiver of underinsurance); *State Farm Mut. Ins. Co. v. Arms*, 477 A.2d 1060 (Del.1984) (ruling that changes to insured vehicle and coverage amounts were material).

We do not find it necessary to weigh the conflicting cases[25] which rely on the concept of material change[26] for purposes of resolv-

---

coverage triggered. Changing the deductible on comprehensive coverage, and adding towing and loss of use to the policy do not constitute such material changes.

While no additional premium cost resulted with the changes made to the policy at issue in Burrows, an additional charge of $342.80 for each six month period was assessed with the changes effected as of September 2000 in Beeler.

**23.** *See supra* note 5.

**24.** In making this argument premised on materiality of change, Ms. Beeler appears to be addressing the initial statutory trigger for offering underinsured motorist benefits—when there is a new application for insurance. Critically, however, the issue of material change does not go to the issue of statutory interpretation that requires a determination of whether a change in coverage limits is confined to a change in the limits of liability coverage.

**25.** *Cf., Jochim v. State Farm Mut. Auto. Ins. Co.*, 90 Wash.App. 408, 952 P.2d 630, 634 (1998)

(holding that where only scope of coverage changes and total amount of liability coverage remains unchanged, there was no material change and no consequent duty to make renewed offer of underinsured motorist coverage); *Torgerson v. State Farm Mut. Auto. Ins. Co.*, 91 Wash. App. 952, 957 P.2d 1283, 1288 (1998) (rejecting perceived bright line rule established in *Jochim* to hold that addition of comprehensive, collision, and death and dismemberment coverage without increase in overall liability limits of policy constituted a material change requiring separate offer of underinsured motorist coverage).

**26.** We agree with the observations made by the amicus that the so-called trend toward resolving these issues in terms of materiality of change is far from being widespread and that utilizing material change as the determinant factor on this issue would more likely result in more uncertainty than clarity, given the arguably inexhaustible host of factors that could be determined to affect the issue of material change.

ing the question of statutory interpretation that is presented here. Instead, we proceed to examine the language at issue to construe the third requirement which governs the issue of when insurers are statutorily mandated to make an offer of underinsured motorist coverage. Although the terms "different coverage limits" appear in West Virginia Code § 33–6–31d(e), we find it necessary to refer to West Virginia Code § 33–6–31(b) for guidance on this issue, given that both of these statutes deal with the optional insurance coverage of underinsurance.

Significant to our discussion is the fact that in structuring the statutory duty imposed on insurers to offer underinsurance, the Legislature expressly tied this type of optional insurance coverage to the limits of liability coverage. The option to purchase underinsurance is stated as follows in West Virginia Code § 33–6–31(b):

> [S]uch policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an ... underinsured motor vehicle up to an amount not less than *limits of bodily injury liability insurance and property damage liability insurance.*

W.Va.Code § 33–6–31(b) (emphasis supplied).

■ The definition of underinsurance that is statutorily provided is also framed with specific reference to liability insurance coverage:

> "Underinsured motor vehicle" means a motor vehicle with respect to the ownership, operation or use of which there is *liability insurance* applicable at the time of the accident, but the limits of that insurance are either: (i) Less than limits the insured carried for underinsured motorists' coverage; or (ii) has been reduced by payments to others injured in the accident to limits

less than limits the insured carried for underinsured motorists' coverage.

W.Va.Code § 33–6–31(b) (emphasis supplied). Nationwide argues that because the statutory definition of an underinsured motor vehicle is expressly tied to and dependent upon the existence of liability coverage, it stands to reason that the Legislature intended to directly link any alteration in liability coverage limits with the need to re-offer underinsured motorist coverage. *See* W.Va. Code § 33–6–31d(e).

Nationwide contends that its position is bolstered by the position taken by the Insurance Commissioner in connection with the forms [27] the Commissioner has promulgated for the offering of this optional coverage.[28] At the bottom of the form is the following language: "I have been given the opportunity to select the optional limits of UNDER insured motor vehicle coverage listed above and have selected the coverage that matches the box I have checked." The form ends with the notice that "[t]hese limits apply until a change in limits is requested." Since the only limits of coverage that are identified on the insurance form offering the underinsured motorist coverage are limits that correspond to bodily injury and property damage liability amounts, Nationwide suggests that the Insurance Commissioner has taken the position that the statutory language which refers to "different coverage limits" was intended to indicate a change in liability coverage limits. W.Va.Code § 33–6–31d(e).

■ The position advocated by Nationwide and purportedly adopted by the Insurance Commissioner is the only interpretation of West Virginia Code § 33–6–31d(e) that withstands scrutiny. Given that the statutory creation of the optional coverages of uninsured and underinsured motorist benefits has a direct nexus to the limits of bodily injury liability insurance and property damage liability insurance,[29] it logically follows that the

**27.** Insurers are required to "use an exact duplicate of the form as to both order and size of print." *See* Ins. Comm'r Informational Letter 88 (July 1993).

**28.** *See* W.Va.Code § 33–2–10 (1957) (Repl.Vol. 2003) (authorizing Insurance Commissioner "to promulgate and adopt such rules and regulations

relating to insurance as are necessary to discharge his duties").

**29.** *See* W.Va.Code § 33–6–31(b) (providing "[t]hat such policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages

Legislature would connect a change in liability limits with the need to redistribute the insurance form offering such optional limits of coverage.[30] Accordingly, we hold that the language contained in West Virginia Code § 33–6–31d(e) that requires insurers to offer underinsured motorist coverage to insureds upon a request for "different coverage limits" refers to a request for different liability coverage limits and does not refer to a request for changes in other types of coverage such as collision, comprehension, loss of use, or towing. Consequently, only changes that are requested by insureds to alter their actual liability coverage will invoke the statutory duty imposed on insurers to make underinsured motorist coverage available within the meaning of West Virginia Code § 33–6–31d(e).

Based on the foregoing, we answered the first certified question in the affirmative and the second certified question in the negative.

Certified questions answered.

Justice McGRAW today, while still dissenting, withdrew his right to file a dissenting opinion in the above-captioned proceeding.

---

from the owner or operator of an uninsured or underinsured motor vehicle *up to an amount not less than limits of bodily injury liability insurance and property damage liability insurance* purchased by the insured") (emphasis supplied).

**30.** *See Allen v. State Farm Mut. Auto. Ins. Co.,* 617 So.2d 1308, 1312 (La.App.1993) (recognizing that "[i]t is the latter coverage [bodily injury liability] which is tied by statute to UM [uninsured motorist] coverage, not comprehensive or collision"). For cases requiring insurer to offer underinsured motorist coverage correspondent to an increase in liability coverage limits, see the

following: *Jochim,* 952 P.2d at 634; *Faucheaux v. Boston Old Colony Ins. Co.,* 633 So.2d 959 (La.App.1994); *Roser v. Anderson,* 222 Ill.App.3d 1071, 165 Ill.Dec. 431, 584 N.E.2d 865 (1991); *see also Spera v. Lyndon Prop. Ins. Co.,* 788 So.2d 56, 60 (La.App.2001) (discussing 1999 amendments to Louisiana statute which now provides that "[a]ny changes to an existing policy, regardless of whether these changes create new coverage, except changes in the limits of liability, do not create a new policy and do not require the completion of new uninsured motorist selection forms").