*McFarland & McFarland, Robert P. McFarland*, for appellees.

## A06A1153. SOUFI v. HAYGOOD et al.
### (639 SE2d 395)

ADAMS, Judge.

This matter arises out of a traffic accident on the evening of September 5, 2002, in which Winifred Soufi, M.D. suffered injuries. Soufi filed suit against Jamie Haygood and John Doe to recover for her injuries, and served Nationwide Mutual Fire Insurance Company, her uninsured motorist (UM) insurance carrier, with a copy of the complaint, because she believed Haygood was uninsured at the time of the collision. Nationwide filed an answer and moved for summary judgment to establish the limits of UM coverage available under the Soufis' insurance policy, which Nationwide claimed to be $100,000 per person, $300,000 per occurrence. The trial court granted the motion and Soufi appeals. We affirm.

In considering an appeal from a grant of summary judgment, this Court applies a de novo standard of review and views the evidence, and all reasonable conclusions and inferences drawn therefrom, in the light most favorable to the nonmovant. *Wentworth v. Eckerd Corp.*, 248 Ga. App. 94 (545 SE2d 647) (2001).

Soufi and her husband, Khaled Soufi, first obtained automobile insurance from Nationwide in January 1998. They purchased two separate policies (Policy Nos. 77N982999 and 77N982998), one for each car they owned at the time: an Acura Integra and a Toyota Camry. The bodily injury liability coverage under each of these policies was $300,000 per person, with a cap in coverage of $300,000 per occurrence. On January 9, 1998, Khaled Soufi signed a form electing UM coverage in the amount of $100,000 per person, with a $300,000 cap per occurrence. Although the form does not reference a specific policy, the record reflects that these UM limits were applied to at least one of the Soufis' original policies, Policy No. 77N982999 covering their 1993 Acura Integra. And the Soufis acknowledged in their briefs to the trial court that Khaled Soufi made the same election on the other policy covering the Toyota Camry. At the same time, the Soufis purchased an umbrella policy, which was required under Winifred Soufi's employment contract. On January 9, 1998, Khaled Soufi signed a form specifically rejecting UM insurance coverage under that policy. Winifred Soufi never signed any UM election form in conjunction with any of the policies.

The Soufis subsequently sold their Camry and Integra and purchased a Dodge Durango and Toyota Sienna, which replaced the

original cars on the Nationwide policies. In 2000, the Soufis purchased an Acura CL32, which was added to one of the existing policies. In June 2001, Khaled Soufi requested that Nationwide put all the family's cars on the same policy. Nationwide cancelled Policy No. 7710N982998 and transferred the vehicle(s) on that policy to Policy No. 7710N982999. On August 20, 2001, the Soufis purchased a fourth vehicle, a Toyota Sequoia, which was added to the consolidated policy in exchange for an additional six-month premium of $413. This was the vehicle Winifred Soufi was driving at the time of the accident.

The declarations page issued after the addition of the Sequoia to the policy specifically provided that the vehicle's UM coverage was $100,000 per person for bodily injury, with a $300,000 cap for each occurrence. The same UM coverage was listed on the declarations page Nationwide issued on June 12, 2002, three months before the accident.

Based upon these facts, the trial court found that the Soufis' policy provided for a maximum of $100,000 in UM benefits per person. And because Winifred Soufi was alone in the car at the time of the accident, Nationwide's maximum liability would be $100,000. But Soufi contends that in making this finding the trial court failed to properly consider the legislature's July 2001 amendment to OCGA § 33-7-11, which provided that if an insured does not elect a lesser amount of UM coverage, the amount of such coverage is the same as the insured's liability coverage. OCGA § 33-7-11 (a) (1) (A). Soufi contends that no election was made regarding UM coverage for the Sequoia, which was added to the policy after the amendment went into effect. Moreover, Soufi contends that she was a named insured under the policy and she never made any election at all. Thus, she contends that her maximum recovery of UM benefits should be $300,000 per person, the same as the liability coverage under the policy.

Soufi is correct that the 2001 amendments gave an insured the option of choosing UM coverage equal to the liability limits in his or her insurance policy:

As amended in 2001, OCGA § 33-7-11 (a) (1) provides that no automobile insurance liability policy may be issued in this state unless it contains provisions for UM coverage which at the option of the insured shall be (i) not less than $25,000 per person and $50,000 per accident, or (ii) equal to the policy's bodily injury liability insurance coverage, if higher. The statute further provides that "[i]n any event, the insured may affirmatively choose uninsured motorist limits in an

amount less than the limits of liability." OCGA § 33-7-11 (a) (1) (B)[, amended by Ga. L. 2001, p. 1228, § 1].

(Punctuation and footnotes omitted.) *McKinnon v. Progressive Bayside Ins. Co.*, 278 Ga. App. 429, 430-431 (629 SE2d 100) (2006). Thus, the 2001 amendment was intended to make a policy's liability limits the default provision for UM coverage, unless an insured affirmatively elects UM coverage in a lesser amount. *Tice v. American Employers' Ins. Co.*, 275 Ga. App. 125, 127-128 (619 SE2d 797) (2005). The amendment retained the insured's option to reject all UM coverage. OCGA § 33-7-11 (a) (3).

The 2001 amendment also contained new language detailing how these provisions applied to renewal policies. The amendment provided that UM coverage did not have to be offered in a renewal policy where it had previously been rejected. OCGA § 33-7-11 (a) (3). Nor did the insurance company have to increase the amount of UM coverage upon renewal:

> The amount of coverage need not be increased in a renewal policy from the amount shown on the declarations page for coverage existing prior to July 1, 2001. The amount of coverage need not be increased from the amounts shown on the declarations page on renewal once coverage is issued.

OCGA § 33-7-11 (a) (3), amended by Ga. L. 2001, p. 1229, § 2.

This Court considered the new renewal provisions in *Tice v. American Employers' Ins. Co.*, 275 Ga. App. at 125-126. In 1996, the Tices had elected to receive only the statutory minimum UM coverage. The policy was periodically renewed, and when the minimum UM coverage amounts were increased in 2000,[1] the policy's UM coverage limits were increased accordingly. But when Renee Tice was injured in a 2003 accident with an uninsured motorist, she sought UM coverage in an amount equal to her policy's liability coverage. She argued that after the 2001 amendment, all new and renewal policies automatically provided UM coverage equal to the liability limits, unless an insured affirmatively chose coverage in a lesser amount. Id. at 127. This Court held, however, that the Tices were bound by their earlier election of the statutory minimum coverage and nothing in the amendment required their insurer to notify them that it was required to offer UM coverage equal to a policy's liability coverage. Id. at 128. The Court further noted that "it could be argued that even for those policyholders who had chosen optional UM coverage in amounts less

---

[1] Ga. L. 2000, p. 1516, § 1.

than their underlying liability coverage, '(t)he amount of coverage need not be increased in a renewal policy . . . for coverage existing prior to July 1, 2001.' " (Footnote omitted.) Id. See also *McKinnon v. Progressive Bayside Ins. Co.*, 278 Ga. App. at 431 (insured who made no UM election is entitled to the default coverage at the time the policy was issued in 2000, not the post-2001 amendment default coverage).

We agree that the 2001 amendment did not change the Soufis' UM coverage to the extent that it existed prior to July 1, 2001. But Soufi argues that the coverage on the Toyota Sequoia did not exist prior to that date, because the Sequoia was not added to the Soufis' policy until August 2001. We disagree.

"Insurance policies are of the nature of personal contracts. The insurer is selective of those risks which revolved around the character, integrity and personal characteristics of those whom they will insure." (Citation and punctuation omitted.) *Higdon v. Ga. Farm &c. Ins. Co.*, 204 Ga. App. 192, 194 (419 SE2d 80) (1992). Thus, the insurance coverage provided under the Soufis' policy was personal to them and did not, for example, transfer upon the sale of their automobiles.[2] Cf. *Langley v. Pacific Indem. Co.*, 135 Ga. App. 29, 31 (4) (217 SE2d 369) (1975). In a sense, therefore, it was not the individual automobiles that were insured by the policy but rather the risk of loss to the Soufis for covered injuries and property damage.

Moreover, Georgia law defines "policy" as "the written contract of or written agreement for . . . effecting insurance. The term includes all clauses, riders, endorsements, and papers attached or issued and delivered for attachment to the contract or agreement and made a part of the contract or agreement." OCGA § 33-24-1 (1). The Soufis' policy specifically made the original declarations a part of the policy, and the subsequent declarations, including those listing the Sequoia, indicated that they were part of the policy. Further, the policy defined the covered automobiles, which are designated in the policy language as "your auto," to be "the vehicle(s) described in the Declarations." We conclude, therefore, that the insurance coverage for the Toyota Sequoia was intended to be part of the original policy, and did not constitute a new policy. The vehicle was simply added to the Soufis' existing automobile coverage, which pre-dated July 1, 2001.[3] Accordingly, Nationwide was not required to notify the Soufis of the change

---

[2] The policy provides that it cannot be transferred without the insurer's written consent, although if the policyholder dies the coverage continues in force for the rest of the policy period and applies to anyone having proper custody of the insured automobiles.

[3] This conclusion is in line with the majority of other states that have addressed this issue, either through statute or case law. See, e.g., *Burrows v. Nationwide Mut. Ins. Co.*, 215 W.Va. 668 (600 SE2d 565) (2004); *Smith v. South Carolina Ins. Co.*, 350 S.C. 82 (564 SE2d 358) (2002);

in the law or to secure a separate UM election at the time the Soufis added the Sequoia to their policy.

*Gulf American Fire &c. Co. v. McNeal*, 115 Ga. App. 286 (154 SE2d 411) (1967),[4] decided well before the 2001 amendment, does not compel a different result. In that case, the insured had purchased a policy before the enactment of Georgia's Uninsured Motorist Statute. See Ga. Code Ann. § 56-407A, enacted by Ga. L. 1963, p. 588, § 1. After the statute went into effect, the insured added an additional automobile to the existing policy. This Court held that the issuance of an endorsement to add another car constituted the issuance of a policy of insurance, which required the offering of UM coverage. *McNeal*, 115 Ga. App. at 290 (2).

We note, however, that "[t]he underlying purpose of uninsured motorist legislation [is] the protection of innocent victims from the negligence of irresponsible drivers." (Citation omitted.) *Terry v. State Farm Fire &c. Ins. Co.*, 269 Ga. 777, 778 (1) (504 SE2d 194) (1998). In *McNeal*, there was no evidence that the insured had ever been offered UM coverage since it was not required at the time the original policy was issued. The public policy behind the statute would be undermined if the insurer were allowed to circumvent the statutory requirement by merely adding cars to a pre-statute policy. Here, in contrast, no such public policy concerns arise. The Soufis were offered UM coverage at the time of their application and had the option, upon payment of the appropriate premium, to secure UM coverage up to their liability limits. They declined to do so, and they are bound by that election.

Nevertheless, Winifred Soufi argues that she should not be bound by her husband's election of limited UM coverage as she never made any election at all with regard to the policy, despite the fact that she is listed as a policyholder. The declarations pages listed both "Khaled & Winifred Soufi" under the heading "Policyholder (Named Insured)," but the definition portion of the Soufis' policy provides that the "policyholder" is only the first person named on the declarations page. The policy explained that "[t]he policyholder is the named

---

*Gasch v. Harris*, 808 S2d 1260 (Fla. Ct. App. 2002); *Vigil v. Rio Grande Ins. Co. &c.*, 124 N.M. 324 (950 P2d 297) (1997); *Colonia Underwriters Ins. Co. v. Richardson*, 325 Ark. 300 (924 SW2d 808) (1996); *Pierce v. Allstate Ins. Co.*, 316 Ore. 31 (848 P2d 1197) (1993); *Johnson v. Farmers Ins. Co. &c.*, 117 Wn.2d 558 (817 P2d 841) (1991); *Makela v. State Farm &c. Ins. Co.*, 147 Ill. App.3d 38 (497 NE2d 483) (1986). We note that *United States Fire Ins. Co. v. Van Iderstyne*, 347 S2d 672 (Fla. Ct. App. 1977), the Florida case upon which Soufi relies, was superseded by a later amendment to Florida's Uninsured Motorist Statute, § 627.727 (1), Fla. Stat. (1981), which provided that UM coverage need not be offered in connection with "a renewal policy[ ] or any other policy which extends, changes, supersedes, or replaces [the] existing policy."

[4] This case was questioned on other grounds. See *Norman v. Daniels*, 142 Ga. App. 456, 459 (2) (a) (236 SE2d 121) (1977).

insured under this policy and does not include the policyholder's spouse." Thus, Khaled Soufi was the named insured under the policy, and he was authorized to elect the UM coverage for the policy, and Nationwide was not required to obtain a separate election from Winifred Soufi. Cf. *Miller v. State Farm &c. Ins. Co.*, 155 Ga. App. 487 (1) (271 SE2d 14) (1980).

Accordingly, we affirm the trial court's grant of summary judgment to Nationwide.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*


DECIDED NOVEMBER 29, 2006.


*Casey, Gilson & Leibel, Steven K. Leibel, Jonathan R. Granade,* for appellant.

*Hawkins & Parnell, Peter A. Jacxsens,* for appellees.


